Ruth BLAKE and Louis Dekmar,
Appellants (Defendants),

v.

Thomas N. RUPE, Appellee (Plaintiff).

Thomas N. RUPE, Appellant (Plaintiff),

v.

Ruth BLAKE and Louis Dekmar,
Appellees (Defendants).

Nos. 5576, 5577.

Supreme Court of Wyoming.

Sept. 14, 1982.

Rehearing Denied Oct. 5, 1982.

Glenn Parker (argued) and Harold F. Buck, Hirst & Applegate, Cheyenne, signed the brief on behalf of appellant Blake.

James E. Fitzgerald, Cheyenne, and F. Michael Ludwig, Wood, Ris & Hames, P.C., Denver, Colo., signed the brief on behalf of appellant Dekmar; Hames appeared in oral argument.

Raymond B. Hunkins and Eric M. Alden, Jones, Jones, Vines & Hunkins, Wheatland, for appellee Rupe.

David A. Kern, Cheyenne, filed amicus curiae brief on behalf of the Wyoming County and Pros. Attys. Ass'n in support of the position of appellants Blake and Dekmar.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

The appellee, Thomas N. Rupe, brought a tort action for damages against appellant Ruth Blake, County and Prosecuting Attorney for Converse County, alleging tortious conduct in connection with the investigation and prosecution of a criminal perjury charge brought against Rupe. In the same action, appellant Louis Dekmar, an investigator for the office of County and Prosecuting Attorney for Converse County, was joined and damages sought against him for alleged tortious conduct in connection with the investigation and filing of the same criminal charge of perjury against Rupe. Following trial by jury, a verdict was returned awarding Rupe $40,000 actual and

$105,000 punitive damages against Blake and $20,000 actual and $35,000 punitive damages against Dekmar. Judgment was entered accordingly.

While many errors by the trial judge are asserted on appeal, disposition can be made on the issue of the scope of immunity, possessed by prosecutor Blake and her investigator Dekmar. The court, at its own suggestion, raised the issue of the timeliness of the notice of appeal which we will discuss (Part VI) in light of the dissents filed herein.

We find the notice of appeal to be timely and will reverse and remand with directions to vacate the judgment in favor of appellee Rupe and enter judgment for appellants Blake and Dekmar.

## I

The facts giving rise to initiation of the tort action will be briefly narrated. Rupe was called for Converse County District Court jury duty in 1979. In two criminal murder cases he, along with other jurors, was interrogated relative to general qualifications to serve. "A person is disqualified to act as juror if he has been convicted of any felony." Section 1–11–102, W.S.1977. Upon being questioned as to whether any had ever been convicted of a felony, none responded, including Rupe.[1] Rupe sat as a juror in both cases. In one, a verdict of acquittal was returned. In the other, a mistrial was declared.

Later, Blake learned through a volunteer informant that Rupe had previously been convicted of a felony—issuing a fraudulent

check. She and Dekmar checked the Natrona County District Court records, where Rupe's trial had taken place in 1950, and at the State Penitentiary to which he had been sentenced and incarcerated. The evidence is in dispute as to whether Blake or Dekmar was informed by penitentiary personnel that Rupe had been pardoned. During the course of the investigation no records at the State Capitol in Cheyenne were checked. The Secretary of State could have furnished a copy of Rupe's discharge paper. Blake, upon the basis of the investigation made, requested that Dekmar filed a perjury complaint against Rupe, which he did on October 11, 1979.

At his justice of the peace appearance for a preliminary hearing, Rupe presented evidence that when released from the penitentiary he had been issued a form of discharge executed by the then Governor of Wyoming which concluded with:

"NOW, THEREFORE, By virtue of the authority vested in me as Governor of the State of Wyoming, I do hereby direct that the said Thomas N. Rupe, No. 7061 be discharged from the Penitentiary of the State of Wyoming, on the Twentieth day of December, 1951 and I do hereby fully restore the said Thomas N. Rupe, No. 7061 to citizenship, which restoration of citizenship shall become effective on said date."

The form of discharge was, at the time of Rupe's discharge from the penitentiary, pursuant to then § 19–1004, W.S.1945 (afterwards § 7–13–107, W.S.1977)[2]:

"The Governor of the State of Wyoming shall, upon receiving a statement of good

1. In one case at the start of jury selection the general qualifications of the jurors were ascertained. Amongst other statutes setting out the qualifications, § 1–11–102 was read to the panel. The district judge requested that anyone convicted of a felony come to the bench and let him know. No member of the panel apparently did so. Rupe was asked, "[d]o you know Mr. Roop [sic] of any reason why you could not serve as a juror?" He replied, "[n]othing other than I [was] asked to be relieved by the city engineer," by whom he was employed.

In the other case, all jurors were advised that a felony conviction would disqualify them for

service as a juror and then asked, "[i]s there anyone here that would fall in that category?" There was a negative response.

2. Effective May 20, 1981, § 7–13–107, W.S. 1977, was changed to provide:

"(a) Upon receipt of a written application, the governor may issue to a person convicted of a felony under the laws of a state or the United States a certificate which restores the rights lost pursuant to W.S. 6–1–104 when:

"(i) His term of sentence expires; or

"(ii) He satisfactorily completes a probation period."

conduct of a convict, whose term is about to expire, from the Warden of the State Penitentiary, immediately issue a certificate for the discharge of such convict; such certificate shall in all cases restore the said convict his rights the same as though full pardon had been granted. The said certificate to be delivered to the convict by the Warden of the State Penitentiary at the expiration of his term."

Another relevant statute before the justice of the peace was § 6–1–104, W.S.1977:

"A person sentenced to the penitentiary for a felony, when sentence has not been reversed or annulled, is incompetent to be an elector or juror, or to hold any office of honor, trust or profit within this state, unless he shall have received a pardon; but no pardon shall release a convict from the costs of his conviction, unless so stated therein." [3]

The justice of the peace dismissed the complaint.

Other facts will be set out as appropriate.

## II

A county and prosecuting attorney in the State of Wyoming "act[s] as prosecutor for the State of Wyoming in all felonies and misdemeanors arising in his [her] county" and prosecutes such cases in the courts of such county, § 18–3–302, W.S.1977, in effect at the time the prosecution involved in this case arose. " * * * All prosecutions shall be carried on in the name and by the authority of the State of Wyoming, and 'conclude against the peace and dignity of the State of Wyoming.' " Section 15, Article V, Wyoming Constitution. Blake, as the duly elected prosecutor, was therefore a proper person charged with the duty of initiating criminal prosecutions on behalf of the state of Wyoming. She was therefore acting within the scope of her duties when she investigated and directed the filing of a complaint against Rupe.

## III

We are satisfied that the touchstone authority for the basis of our disposition of this appeal rests in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). It was there held that a state prosecuting attorney acting within the scope of his duties in initiating and pursuing a criminal prosecution and in presenting the State's case is absolutely immune from a civil suit for damages under 42 U.S.C. § 1983 [4] for alleged deprivations of constitutional rights. The sweep of the opinion specifically takes in and approves the common-law rule of absolute immunity for a prosecutor acting within the scope of his duty.[5] In the use of *Imbler,* we hasten to mention at this point, that we recognize that the United States Supreme Court reserved until another time a final settlement of the extent to which absolute immunity attaches to those aspects of the prosecutor's responsibility which assign him/her the role of administrator and investigator. We will further on in this opinion deal with a prosecutor's immunity while performing his/her administrative and investigative functions, since appellee

---

**3.** Section 6–1–104, W.S.1977, was changed in 1981 to provide:

"(a) A person convicted of a felony is incompetent to be an elector or juror, or to hold any office of honor, trust or profit within this state, unless:

"(i) His conviction is reversed or annulled;

"(ii) He receives a pardon; or

"(iii) His rights are restored pursuant to W.S. 7–13–107."

**4.** 42 U.S.C. § 1983:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

**5.** See *Yaselli v. Goff,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927) affirming 12 F.2d 396 (1926), in which the court of appeals discusses at length the common-law immunity of judges, grand jurors, petit jurors, advocates, and witnesses approved in *Butz v. Economou,* infra.

frames his causes of action around that phase of Blake's prosecution of Rupe. Though the tenor of Rupe's tort action in all aspects was that Blake's prosecution was based in anger with spiteful motives because one jury with which Rupe sat acquitted the defendant, Rupe does not allege malicious prosecution as such.

■ In the meantime, because of the inseparability of some investigations by the prosecutor and initiation of a prosecution, which we discern to be the situation before us, it is important to point out the reasons for absolute immunity.

"The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties. These include concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust. One court expressed both considerations as follows:

" 'The office of public prosecutor is one which must be administered with courage and independence. Yet how can this be if the prosecutor is made subject to suit by those whom he accuses and fails to convict? To allow this would open the way for unlimited harassment and embarrassment of the most conscientious officials by those who would profit thereby. There would be involved in every case the possible consequences of a failure to obtain a conviction. There would always be a question of possible civil action in case the prosecutor saw fit to move dismissal of the case. * * * The apprehension of such consequences would tend toward great uneasiness and toward weakening the fearless and impartial policy which should characterize the administration of this office. The work of the prosecutor would thus be impeded and we would have moved away from the desired objective of stricter and fairer law enforcement.' Pearson v. Reed, 6 Cal.App.2d 277, 287, 44 P.2d 592, 597 (1935)." (Footnote omitted.) Imbler v. Pachtman, supra, 424 U.S. at 422–424, 96 S.Ct. at 991–992, 47 L.Ed.2d at 139–140.

As further pointed out in Imbler, without absolute immunity the performance of the prosecutor's duties would be undermined by the constant threat of a suit for damages. If a prosecutor had to make every move in the performance of his/her work on the basis of a potential personal liability, the public trust in the prosecutor's office would suffer in that his/her judgment would be colored by such constraints. In the light of the nature of what is seen as a litigant's society, such suits could be expected with some frequency because of resentment by criminal defendants against prosecutors. Such preoccupation with defending such actions would divert the attention and energy of the prosecutor away from the urgent duty of enforcing the criminal law. Defending every decision made and action taken could impose intolerable burdens.

■ As conceded in Imbler, absolute immunity leaves the genuinely wronged criminal defendant without civil redress against a malicious or dishonest prosecutor. That would certainly include the lesser evil of the negligent prosecutor. It is not the office of this court in this case to either castigate or defend the Converse County prosecutor for the action taken upon the basis of the investigation made. Her unhampered duty to exercise judgment in the prosecutive decision must not be blurred by concerns and reluctance which would appear in the shadow of the fear of retaliation. To take away or qualify the immunity would disserve the broader public interest and prevent vigorous and fearless performance of duty as a public prosecutor, so essential to the success of the criminal justice system.

The rule of absolute immunity for prosecutors has, since Imbler, been reaffirmed in Butz v. Economou, 438 U.S. 478, 510, 98 S.Ct. 2894, 2912–2913, 57 L.Ed.2d 895, 918–919 (1978). The court, there quoting Imbler, reiterated that " '[t]he common-law

immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties.' 424 U.S. at 422–423, 96 S.Ct. 984 at 991–992, 47 L.Ed.2d 128." Further, the prosecutor is entitled for stated and practical reasons to absolute immunity. His activities are "activities [which] were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." *Imbler*, supra, 424 U.S. at 430, 96 S.Ct. at 994–995, quoted in *Butz*, supra, 438 U.S. at 511, 98 S.Ct. at 2913.

Again, in *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 736, 100 S.Ct. 1967, 1977, 64 L.Ed.2d 641, 656 (1980), the court in reviewing all the situations in which immunity from damage actions existed, declared again that prosecutors enjoy absolute immunity from damage liability, citing *Imbler*, supra. Most recently, we find the rule again upheld in *Harlow v. Fitzgerald*, —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and *Nixon v. Fitzgerald*, —— U.S. ——, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982).

Wherever we turn, with rare exceptions [6], the absolute-immunity rule for prosecutors prevails. Restatement, Torts 2d § 656 provides:

"A public prosecutor acting in his official capacity is absolutely privileged to initiate, institute, or continue criminal proceedings.

\*    \*    \*    \*    \*    \*

Comment b. "The privilege stated in this Section is absolute. It protects the public prosecutor against inquiry into his motives, and from liability, even though he knows that he has no probable cause for the institution of the proceedings and initiates them for an altogether improper purpose."

See also, § 895D(1)(2), Restatement, Torts 2d, infra. The doctrine is solidly established. The ballot and formal removal proceedings are more appropriate ways to enforce honesty and efficiency of prosecutors. *Bauers v. Heisel*, 361 F.2d 581, fn.9 (3rd Cir. 1966), cert. denied 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457.

## IV

Rupe instituted a civil action against Blake and the case was eventually tried on his charges of (1) negligence in hiring and supervising appellant Dekmar, (2) negligence in her investigation of Rupe, (3) intentional infliction of emotional distress, and (4) violating Rupe's right to privacy and the quiet enjoyment of life by publicizing his prosecution. A count for violation of Rupe's civil rights under 42 U.S.C. § 1983 was dismissed by the trial judge at the close of plaintiff's evidence and did not serve as a basis of the verdict and judgment.

■ In response to Blake's claim of absolute immunity for prosecutors, appellee argues that the activities which gave rise to his causes of action were within the administrative and investigative functions of the county and prosecuting attorney's office and therefore not within the immunities pronounced by *Imbler*, supra. The plurality opinion in *Imbler* closed with:

"\* \* \* We have no occasion to consider whether like or similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate.[33] \* \* \*"

By footnote 33 to that statement, it was significantly said:

"We recognize that the duties of the prosecutor in his role as advocate for the State *involve* actions preliminary to the initiation of a prosecution and actions apart from the courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make deci-

---

**6.** *Orso v. City and County of Honolulu*, 56 Haw. 241, 534 P.2d 489 (1975); *Cashen v.*

*Spann*, 66 N.J. 541, 334 A.2d 8 (1975), cert. denied 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 46.

sions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. *Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.* At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them." (Emphasis added.)

It is clear that the office of prosecutor does not alone give absolute immunity to the prosecutor but the function performed governs. We conclude, upon the basis of further research, that in drawing that line, Blake's employment and supervision of Dekmar, her conduct preliminary to initiation of a prosecution of Rupe, and her conduct during the course of prosecution, came within the perimeter of the quasi-judicial function and absolute prosecutorial immunity should be afforded her.

Ever since *Imbler,* many courts have been in the process of drawing the outer boundary at which the prosecutor's quasi-judicial function ends. The actions of the prosecutor here were not outside the limits those courts have found to exist. We will review some of those cases considered pertinent.

An action had been brought by a witness against a district attorney and his assistant for slander, conspiracy to slander, abuse of process, invasion of privacy and intrusion on seclusion in *Sampson v. Rumsey,* 1 Kan. App.2d 191, 563 P.2d 506 (1977). There the court, upon confirming that absolute privilege is founded on public policy, extended the immunity to those in public service in the administration of the laws. While doing so, the court referred to some of the protected functions involved. It declared that there was a duty upon prosecutors to

inquire into the facts of alleged violations of the law. Accordingly the investigation, as an integral part of the prosecutor's functions, is "unquestionably" included within the scope of the immunity regardless of the motives and it may not be the subject of a lawsuit. The court also held that reference during closing argument to a witness as a "liar" and a "son of a bitch" was likewise covered by absolute immunity even if actionable. See also, *Knight v. Neodesha, Kansas Police Department,* 5 Kan.App.2d 472, 620 P.2d 837 (1980), citing *Sampson* as precedent.

In another case, a complaint was filed in a Montana district court charging and seeking damages against the prosecutor for acting maliciously, negligently, without probable cause and in violation of civil rights in charging the plaintiff with various felonies which were later dismissed by the prosecutor. Upon motion based upon immunity the district judge of the court in which the civil complaint was filed had refused to dismiss. By a special proceeding in the supreme court the Montana Attorney General sought a ruling that the prosecutor was immune. In *State ex rel. Department of Justice v. District Court of Eighth Judicial Dist.,* 172 Mont. 88, 560 P.2d 1328 (1976), it was held that when a prosecutor acts within the scope of his duties by filing and maintaining criminal charges he is absolutely immune from civil liability, regardless of negligence or lack of probable cause. The court adopted the concept that if a prosecutor must weigh the possibilities of precipitating tort litigation by his instituting criminal prosecutions, his freedom and independence would be at an end. The Montana court granted original relief because of the danger of substantial prejudice which might have resulted forcing the prosecutor to defend a suit where, as a matter of law, liability cannot be established.

Where all acts of the district attorney are intrinsic parts of the prosecutorial function, regardless of motive, to adopt a lax rule would be to turn society over to the lawless by creating a dread on the part of anyone who would dare to prosecute. *Powell v.*

*Seay,* Okl., 553 P.2d 161 (1976). The court in *Powell* allowed a writ of prohibition to avoid a burdensome and expensive trial.

The district attorney, in *Torres v. Glasgow,* 80 N.M. 412, 456 P.2d 886 (1969), during the course of his investigation caused issuance of a search warrant for the search of a house and the seizure of a child, in connection with a criminal charge of false imprisonment against the child's father complained of by the child's mother. The court held that, even though habeas corpus would have been the correct remedy because a child not being property is not the proper subject of a search warrant, absolute immunity required dismissal of the damage action which followed.

In *Candelaria v. Robinson,* 93 N.M. 786, 606 P.2d 196 (1980), an assistant district attorney prepared a report regarding the investigation of a murder case by the plaintiff law officer at the request of the district attorney. The report of investigation stated that the plaintiff used highly improper gestapo-type tactics in the course of the investigation. The court held that absolute immunity from a civil suit for damages was accorded to district attorneys for defamation reasonably related to communication preliminary to, in the institution, or during the course of, and as a part of judicial proceedings in which the attorney participates as counsel. Even though the prosecution referred to had been closed, one of the district attorney's duties was to advise the sheriff when requested. The request involved one of the sheriffs underlings being considered for termination. The material was released at a press conference. The court held it proper and within absolute immunity to inform the public as a matter of public interest of his official acts where they were within the scope of his duties. See also, *Adams v. Tatsch,* 68 N.M. 446, 362 P.2d 984 (1961), and *Matson v. Margiotti,* 371 Pa. 188, 88 A.2d 892 (1952), cited in support. As to the investigative phase, the court pointed out that it was the county attorney's duty in a prosecution to investigate and inquire into the facts.

In *Foster v. Pearcy,* Ind., 387 N.E.2d 446 (1979), cert. denied 445 U.S. 960, 100 S.Ct. 1646, 64 L.Ed.2d 235, the plaintiff in a defamation suit against a prosecutor and his deputy alleged (1) that he had been indicted on a narcotics charge which was later dismissed for procedural reasons; (2) while the indictment was pending, the prosecutor's deputy advised a newspaper reporter that the plaintiff had grossed $18,000 a week from heroin sales, was part of a nation-wide heroin ring and the indictment was the result of two months investigation; and (3) the prosecutor was negligent in hiring and supervising his deputy. The court held:

> "* * * The prosecutor, as an elected law enforcement official, has a duty to inform the public regarding cases which are pending in his office. He must be able to exercise his best judgment, independent of other irrelevant factors, in serving as the State's advocate and in communicating such developments and events to the public. Were a prosecutor granted only a qualified immunity, the threat of lawsuits against him would undermine the effectiveness of his office and would prevent the vigorous and fearless performance of his duty that is essential to the proper functioning of the criminal justice system. 'The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages.' *Imbler v. Pachtman,* supra, 424 U.S. at 424–5, 96 S.Ct. at 922, 47 L.Ed.2d at 140."

As to the alleged negligent hiring of his deputy, the court held that it is a well known common-law rule that an official who has discretionary functions enjoys immunity for acts within the scope of his employment and will not be held liable for errors, mistakes of judgment or unwise decisions in the exercise of that discretion. The court held that employment and supervision of his employees is a discretionary function.

In *Kuchenreuther v. Whatcom County,* 24 Wash.App. 716, 604 P.2d 499 (1979), after dismissal of an information, the prosecuting

attorney was sued for malicious prosecution and outrage alleging in particular that he:

"willfully, wantonly, maliciously, wrongfully, and outrageously abused the prosecutorial processes and acted outside of said process in an improper and perverted manner to accomplish a result outside the lawful purposes of legal process." 604 P.2d at 500.

Summary judgment was held to be proper under prosecutors' absolute immunity for acts performed in connection with the prosecution. Iowa likewise grants this broad absolute immunity to prosecutors. *Gartin v. Jefferson County,* Iowa App., 281 N.W.2d 25 (1979), *supreme court rehearing denied.*

We can see, then, that since *Imbler* the state high courts have been extending the boundary to a considerable extent. The federal courts have done likewise, though probably not as uniformly as have the state courts.

In *Atkins v. Lanning,* 556 F.2d 485 (10th Cir. 1977), the state prosecutor filed felony charges by mistake against the wrong person. The arrested person sued after having been held in jail or a mental institution for some 33 days. Citing *Imbler,* it was held that the prosecutor had absolute immunity in spite of the misfire. It was explained by the court that the investigative work done in preparing and presenting a case by the prosecutor was a part of the judicial function for which absolute immunity is granted and that some leeway is needed to perform the function of assembling the State's case, including a preliminary investigation.

■ The federal courts must apply a functional analysis to determine whether the prosecutor's acts fall within the bounds of "judicial" as opposed to "investigative or administrative" duties. *Ross v. Meagan,* 638 F.2d 646 (3rd Cir. 1981). This deserves analysis. In the case before us, the real cause of Rupe's purported damages was the filing of the complaint charging him with perjury. That is a "judicial" process involving the courts. While negligence in investigation and other acts of negligence and misconduct are alleged as a basis for awarding damage, once the criminal complaint is filed, then we must examine the other acts to determine if they are related to the prosecutor's role as an advocate. As held in *Forsyth v. Kleindienst,* 599 F.2d 1203 (3rd Cir. 1979), cert. denied 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997, a prosecutor is absolutely immune from suit where the allegations of the complaint relate solely to initiating and presenting a criminal case. The court said:

"* * * To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decision-making and the potential for needless actions. * * *" 599 F.2d at 1215.

In *Forsyth* it was held that Attorney General Mitchell would not be absolutely immune from suit unless he authorized a warrantless wiretap in the performance of a function intimately related to the judicial process. The record there was not clear as to whether a criminal case had been initiated, so the circuit court remanded for that determination by the district court.

In *Apton v. Wilson,* 165 D.C.App. 22, 506 F.2d 83 (1974), it was held on summary disposition that the Attorney General of the United States, his deputy and assistant did not have absolute immunity in directing District of Columbia police investigative activity which led to innocent plaintiffs being swept up in mass arrests and deprived of Fourth and Fifth Amendment rights. There they were acting not as advocate prosecutors but only within their duties related to a disruption of federal government operations and were entitled only to a qualified immunity. In *Guerro v. Mulhearn,* 498 F.2d 1249 (1st Cir. 1974), it was held that there could be no summary disposition on the basis of absolute immunity in the face of an allegation that the prosecutor conspired with police officers to use perjured testimony in obtaining a search warrant. The act there was related to an investigatory rather than judicial role of the district attorney and entitled him to only qualified immunity because, as the court stated, "[i]t

would be wrong to hold the officers liable but the State's Attorney exempt." 498 F.2d at 1256, quoting *Lewis v. Brautigam,* 227 F.2d 124, 129 (5th Cir. 1955).

■ Deliberate leaking of false information by a prosecutor about a plaintiff to damage his political prospects, if it in fact occurred, is outside the rationale for absolute immunity and at most, subject to a qualified good-faith immunity. *Helstoski v. Goldstein,* 552 F.2d 564 (3rd Cir. 1977). There, the circuit court remanded for completion of discovery.

In *Hampton v. City of Chicago, Cook County, Illinois,* 484 F.2d 602 (7th Cir. 1973), cert. denied 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974), it was held on a motion to dismiss that the state's attorney had no absolute immunity for planning to use excessive and deadly force and then executing an illegal raid by police officers where the purpose was to "create fear and terror in the Black Community."

In *Dodd v. Spokane County, Washington,* 393 F.2d 330 (9th Cir. 1968), it was held on a motion to dismiss that there is no absolute immunity to claims for damages against a prosecutor on the ground that he conspired with officers and subjected plaintiff to threats of violence, actual assaults and other punishing treatment in order to force him to testify falsely against an accused in a criminal trial. To the contrary, absolute immunity of prosecutors would support dismissal of a complaint for damages charging that the prosecutor used perjured testimony to obtain plaintiff's conviction in that such allegations related to the prosecutor's actions in his role as an advocate associated with the judicial function. *Brawer v. Horowitz,* 535 F.2d 830 (3rd Cir. 1976).

A good example of the type of administrative role of a prosecutor which carries no absolute immunity is found in *Mancini v. Lester,* 630 F.2d 990 (3rd Cir. 1980). There a lieutenant detective in a prosecutor's office filed an action against the county prosecutor seeking damages for forcing him to resign on the basis of false charges and thereafter preventing him from obtaining a new job. There was no criminal action

against plaintiff. Under such a factual situation and applying the functional test— not the official status of the prosecutor— the court held that there would be no absolute immunity if the prosecutor was acting in a purely investigative or administrative capacity, which the facts seem to indicate.

In citing some of the foregoing cases not in point for disposition here, we do so only for purposes of illustrating what the courts are doing in trying to bracket the scope of immunity and we do not purport by citation to decide various unrelated situations in advance. We only decide the case now before us on its facts and circumstances and use only the authority pertinent thereto.

■ Stated in universal terms, from all of the foregoing, we conclude and hold that to the extent the securing of information is necessary to a prosecutor's decision and preparation to initiate a criminal prosecution, the shield of absolute immunity attaches and at that point the inquiry as to immunity is concluded. It is not our intent that this rule be so stingily applied that a prosecutor feels threatened by a suit for damages if his/her investigation is too thorough; otherwise the objectives sought by immunity would be seriously impaired or destroyed. This is not an area in which a sharp line may be drawn, other than by a test of reasonableness. Taking into consideration the perimeters drawn by the many state and federal courts, the facts of this case disclose that before initiating the criminal prosecution against Rupe, and in order to prepare for the event, it was necessary, in making the decision to prosecute, that Blake check out the information received that Rupe was a convicted felon. That the investigation was inadequate or negligently or spitefully undertaken without probable cause is irrelevant to the question of immunity once the necessity is shown. The absolute immunity defeats the action at the outset. *Imbler,* 424 U.S. at 419, fn.13, 96 S.Ct. at 989.

In consideration of the facts before us, as a postscript, it is worthy of weight that the prosecution of Rupe was because of what

the prosecutor considered perjury by a prospective juror, arising in a judicial proceeding by failure to disclose a conviction of a felony. In performing the investigative function, the integrity of the judicial process was at stake, so not only do we have an investigation involving the initiation of a criminal prosecution, but a prosecution resulting from alleged in-court perjury. We therefore find a greater involvement of the judicial function than the usual investigation by a prosecutor in preparation for initiation of the criminal process by filing of a complaint and trial. To this we add the fact that for purposes of exercising a peremptory challenge, it is probably important that the prosecutors know if a prospective juror was ever convicted of a crime, even though pardoned. However, the questioning in the case before us did not hone that fine. This may be a matter of future concern to prosecutors.

■ On the matter of the news media release [7] announcing the prosecution of Rupe, we hold that such a release is within the outer perimeter of the prosecutor's authority and discretion. In *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), an official of a federal agency was held to have absolute immunity from a libel action in suspending government employees and announcing by way of a press release the reasons for doing so. It was held that the press release was an appropriate exercise of discretion within the scope of the officer's duties, a matter of wide public interest and concern. See also *Spalding v.*

*Vilas,* 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), where an attorney who had been representing certain postal employees in collecting salary claims sued the postmaster general for libel because he circularized information to postal employees that no attorney was necessary to collect certain salary adjustment claims, authorized by Congress. The Court held that the postmaster general had absolute immunity and his motives could not be questioned.[8] In *Candelaria v. Robinson,* supra, it was held proper for a prosecutor to, by press release, inform the public as a matter of public interest of official acts within the scope of his duties. Even if it was defamatory, which it was not, see Comment c to § 656, Restatement, Torts 2d, supra:

> "c. *Policy of the law.* The absolute privilege of the public prosecutor under the rule stated in this Section is based upon the same policy of law that gives immunity from liability to a public prosecutor who, in the course of a criminal prosecution, publishes defamatory matter about the accused or third persons, on which see § 586, Comment b."

Section 586:

> "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as coun-

---

**7.** The news release as reflected by news media clippings:

> "DOUGLAS—A Douglas city employee has been charged with perjury, the Converse County attorney's office said Thursday.
> "The charge against Thomas Rupe, a Douglas building inspector, states that Rupe was convicted of a felony and served a prison sentence but did not say so when interviewed for jury duty, a spokesman for the county attorney's office said.
> "Persons convicted of a felony are not qualified to serve on a jury.
> "Rupe was a member of the 1979 jury panel of the Eighth Judicial District. He served on the jury panel in the August first-degree murder of Donald Gorman, who was found innocent.

> "He was also tentatively seated as a juror for the first-degree murder trial of Dennis and Derrick Parkhurst of Casper, which ended in a mistrial Sept. 20 before jury selection was completed.
> "Prospective jurors are told in one statement at the beginning of selection if any have been convicted of a felony, are disabled or are over-age, *that they are not qualified."*

**8.** See *Walker v. Cahalan,* 542 F.2d 681 (6th Cir. 1976), cert. denied 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 357, where prosecutor was not granted absolute immunity for press release made after there was nothing pending in court because of a nolle prosequi, to which case it pertained.

sel, if it has some relation to the proceeding."

Comment b to § 586:

> "b. *Prosecuting attorneys.* The rule stated in this Section is applicable to attorneys who participate in judicial proceedings, whether civil or criminal. It protects a prosecuting attorney as well as a defense attorney in a criminal action. So too, it affords protection to a prosecuting attorney while conducting an investigation before a grand jury, and this is true irrespective of the outcome of the investigation."

See also, *Foster v. Pearcy,* supra.

We likewise so hold. For the same reasons we find no objection to the prosecutor informing Rupe's employer that charges had been filed against Rupe.[9] The employer had a right to know.

The hiring of Blake's investigator was discretionary. *Foster v. Pearcy,* supra; § 895D(3)(a), Restatement, Torts 2d, infra.

Blake's motion to dismiss should have been granted.

### V

As to Dekmar, the case was submitted to the jury upon the plaintiff's claims of (1) maliciously instituting criminal proceedings against plaintiff; (2) negligently or recklessly conducting his investigation of the perjury charges against plaintiff; (3) intentionally or recklessly causing plaintiff severe emotional distress; and (4) by publicizing matters of a kind highly offensive to an ordinary man concerning the private life of the plaintiff.

The liability or non-liability of Dekmar is based upon a different rule than that applicable to Blake. As an investigator, he performs police and investigative functions. It is not his function to enter into and make the decision to prosecute, nor does he have the responsibility of presenting the State's case for determination. His role does not have the intimate association with the judicial function as that thrust upon the prosecutor. Accordingly, the courts almost unanimously apply a rule of qualified immunity to one in Dekmar's position. The test is whether the complained of action was taken in good faith with reasonable grounds therefor in the light of all the circumstances.

Different than in the case of prosecutors, the common law has never granted police officers an absolute immunity. *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). That case is one of the root authorities for this court's decision in *Rodarte v. City of Riverton,* Wyo., 552 P.2d 1245 (1976), upon which Rupe seems to rely. *Rodarte* only decided that, in a civil action for wrongful arrest or imprisonment involving a warrantless arrest, the police officer had as a defense that he acted in good faith and with probable cause, a jury question. We do not in the case before us have a warrantless arrest but a summons [10] to appear issued upon a complaint. Rupe was not arrested and spent no time in custody or in jail.

Rupe also cites *Consumers Filling Station Company v. Durante,* 79 Wyo. 237, 333 P.2d 691 (1958) to support his position that Dekmar participated in this prosecution by filing a complaint against Rupe without probable cause, one of the elements of malicious prosecution. That case is not in point in that it involves an allegedly malicious civil action initiated by a private person. Malicious prosecution is not an action available against a law enforcement official. The elements of such an action are as set out in § 653, Restatement, Torts 2d:

> "A private person who initiates or procures the institution of criminal proceed-

---

9. Section 577, Restatement, Torts 2d:

"(1) Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed.

"(2) One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication."

10. A summons may be issued instead of a warrant of arrest when requested by the county attorney. Rule 4, W.R.Cr.P.J.C.

ings against another who is not guilty of the offense charged is subject to liability for malicious prosecution if

"(a) he initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and

"(b) the proceedings have terminated in favor of the accused."

Dekmar is not a private person.[11] This view is supported by Annotation, Civil liability of law enforcement officers for malicious prosecution, 28 A.L.R.2d 646 and Prosser, Torts § 119, pp. 837–838 (4th ed. 1971). The prosecutor, not the officer lodging charges, was responsible for the prosecution in this instance, as well.

On the other hand, Dekmar claims that he is entitled to absolute immunity. His defense is premised upon the state of the facts which indicate that he only did what he was told to do by Blake, the prosecutor. The evidence further indicates that most of the investigation was conducted by Blake. The press releases were prepared by Blake and distributed by Dekmar.

There is a special body of law which has been developed to give a measure of protection to a public official from the harassment and risk of being mulcted in damages for mistakes he may make in the performance of his public duties. The background of the rule is best articulated in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974):

"* * * [T]he common law soon recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability. This official immunity apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that

the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

\*    \*,    \*    \*    \*    \*

"* * * [I]t is important to note, even at the outset, that one policy consideration seems to pervade the analysis: The public interest requires decisions and action to enforce laws for the protection of the public. Mr. Justice Jackson expressed this general proposition succinctly, stating 'it is not a tort for government to govern.' *Dalehite v. United States,* 346 U.S. 15, 57, 73 S.Ct. 956, 979, 97 L.Ed. 1427 (1953) (dissenting opinion). Public officials, whether governors, mayors or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury from such error than not to decide or act at all. In *Barr v. Matteo,* 360 U.S. 564, 572–573, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959), the Court observed, in the somewhat parallel context of the privilege of public officers from defamation actions: 'The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government.' See also *Spalding v. Vilas,* 161 U.S., at 498–499, 16 S.Ct., at 637."

■ While Dekmar had the badge of a deputy sheriff to facilitate the execution of his duties, he was not acting in that capacity. His responsibility must be tested by what function he was performing with re-

---

11. Even if such an action were available, Dekmar would have a complete defense in that he acted not only upon advice of counsel but at the direction of Blake, the prosecutor. *Boyer v. Bugher,* 19 Wyo. 463, 120 P. 171 (1912); Restatement, Torts 2d § 666. It would be an obvious injustice to hold the prosecutor immune and the investigator liable. There must be symmetry of treatment. Police officers are not required to predict at their peril whether the prosecutor's advice and direction were lawful.

spect to plaintiff's claim. His office was that of investigator hired by the county and prosecuting attorney to do such investigative work as she might assign. There can be no question but that he is a part of the executive branch of government. His duties on no occasion would ever rise to those of quasi-judicial such as attach to a prosecutor when involved in and preparing for initiation of a criminal prosecution.

The Supreme Court in *Scheuer* fashioned a rule we hold applicable to Dekmar:

"* * * [A] qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. * * *"

Dekmar had no discretion or responsibility in making the decision to prosecute. He was a layman not acting as one learned in the law, acquainted with the nuances of whether Rupe had been pardoned.[12] The investigation had been conducted by his superior and there is no showing that he had reason to question her professional skills. There is no question that Rupe was convicted of a felony and that he did not mention that fact upon general questioning of the jury. In fact, according to Rupe's own testimony, he was not aware of any document that his civil rights had been restored or a certificate of discharge issued until produced at the preliminary hearing.

The rule of *Scheuer* is more simply stated to be that a public official enjoys a qualified immunity if he in good faith entertains a reasonable belief that his actions are lawful, notwithstanding a subsequent judicial determination that they are not; courts will not unfairly use hindsight in assessing official actions challenged in litigation. *Apton v. Wilson,* supra, 506 F.2d 83.

That rule of qualified immunity for police, including investigators and other members of the executive branch, is a generally accepted doctrine. *Atkins v. Lanning,* supra; *Ross v. Meagan,* supra; *Forsyth v. Kleindienst,* supra.

The rule as we have stated it has arisen principally in cases claiming a violation of civil rights under the federal Civil Rights Act, 42 U.S.C. § 1983. However, we adopt it as equally applicable to the allegedly tortious conduct of public officers against whom damages are sought. We find it singularly simple and much easier to apply than the many complexities found in the general law of torts. It is not inconsistent with the rule of law set out in § 895D, Restatement, Torts 2d, and as explained by accompanying comments:

"(1) Except as provided in this Section a public officer is not immune from tort liability.

"(2) A public officer acting within the general scope of his authority is immune from tort liability for an act or omission involving the exercise of a judicial or legislative function. [Prosecutor]

"(3) A public officer acting within the general scope of his authority is not subject to tort liability for an administrative act or omission if

"(a) he is immune because engaged in the exercise of a discretionary function,

"(b) he is privileged and does not exceed or abuse the privilege, or

---

**12.** In order to determine whether Rupe had been pardoned, it was necessary to sift through the statutes. His discharge document did not use the term "pardon." At the time of filing the criminal complaint against Rupe for perjury, the Wyoming procedure of pardoning a prisoner on discharge was somewhat unique. No similar treatment was given the criminal convicted of a felony who successfully concluded a period of probation. That appeared to be an inconsistency in the law, eventually recognized by the amendment of 1981, fn.2, supra. The unusual automatic pardon has thus been eliminated. As indicated in the concurring opinion, whether Rupe was lawfully pardoned is not open and shut.

"(c) his conduct was not tortious because he was not negligent in the performance of his responsibility."

Comment (e) after discussing absolute immunity goes on to explain:

"In a second situation, the existence of the 'immunity' may be treated as meaning that the officer is not liable if he made his determination and took the action that harmed the other party in good faith, in an honest effort to do what he thought the exigencies before him required. Here, in a suit against him, his good faith is an issue of fact before the court and there is always the possibility that the court may make an incorrect determination regarding it. It may be questioned whether this is more properly called an immunity or a privilege. If the action against the officer is for an intentional tort in which the officer knows that he is imposing the harm on the other party or is substantially certain to do so, this could properly be called a privilege. But if the action is for negligence, for acting or failing to act, thus creating an unreasonable risk of harm, it would be called an immunity. There are no privileges in a negligence action, since the issues involved are treated in the issue of whether the conduct was negligent. For this reason it seems appropriate to treat the defense as an immunity in both situations. It is a limited immunity, but it is as broad as good faith.

"In a third situation, the existence of the 'immunity' may mean that the officer is not liable if his determination to take or not to take the action was reasonable. In a tort action against him, there is thus another issue of fact—the reasonableness of his decision, if he is acting in good faith. The trier of fact is not deciding whether he was right in his determination but whether he made a reasonable determination. In an action for an intentional tort, this is accurately described as a privilege. It is sometimes described as a defeasible or conditional privilege, as distinguished from an absolute privilege. In an action for negligence, the question of whether the officer acted reasonably is actually one of whether he was negligent or not. The standard of what a reasonably prudent person would do under like circumstances applies. One of the circumstances is that he may be acting in a professional capacity rather than performing ministerial acts. This means that, like the doctor or lawyer, he is held to a higher degree of skill and knowledge and training and expertise, but also that he may be given substantially wider discretion in the exercise of that knowledge and expertise and that he may be held not liable for a 'mere error judgment.' This is sometimes expressed by saying that he is liable only for action that is palpably unreasonable. It is misleading and productive of confusion to speak of immunity to tort liability in either of these situations."

This court, in *Wendling v. Cundall*, Wyo., 568 P.2d 888, 890 (1977), has expressed an Illinois definition of "good faith" as being honest, lawful intent, and the condition of acting without knowledge of fraud and without interest to assist in a fraudulent or otherwise unlawful scheme, together with the definition set out in *Cone v. Ivinson*, 4 Wyo. 203, 33 P. 31 (1893):

"* * * 'Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even though the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious.'"

While the term "reasonable" hardly needs defining, this court has undertaken to do so in *Claussen v. State*, 21 Wyo. 505, 516, 133 P. 1055, 1056 (1913), wherein it was explained from Webster "as having the faculty of reason; rational; governed by reason; being under the influence of reason; thinking, speaking, or acting rationally, or according to the dictates of reason; agreeable to reason; just; rational." We find no evidence of bad faith or unreasonable conduct by Dekmar; so we must conclude as a matter of law that he acted reasonably, in good faith in light of all the circumstances existing at the time. Dekmar's motion for

summary judgment should have been granted, or, at the very latest, Dekmar's motion for a directed verdict at the close of plaintiff's evidence should have been granted.

## VI

█ This part is added because we raised the issue of timeliness of the notice of appeal. The parties are entitled to know not only that we hold the notice timely, but also the reasoning therefor. The design of this part also meets the dissenting opinions. The concurring opinion bolsters the views here expressed.

The applicable rules for interpretation are:

Rule 2.01, W.R.A.P., in pertinent part: "An appeal, civil or criminal, permitted by law from a district court to the Supreme Court, shall be taken by filing a notice of appeal with the clerk of the district court within fifteen (15) days from entry of the judgment or final order appealed from and serving the same in accordance with the provisions of Rule 5, W.R.C.P., unless a different time is provided by law * * *. *The running of the time for appeal in a civil case is terminated as to all parties by a timely motion made by any party pursuant to any of the rules hereinafter enumerated, and the full time for appeal commences to run and is to be computed from the entry of any of the following orders made upon timely motion under such rules, or when such motions are deemed denied: granting or denying a motion for judgment under Rule 50(b), W.R.C.P.; granting or denying a motion under Rule 52(b), W.R. C.P., to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; granting or denying a motion under Rule 59, W.R.C.P., to alter or amend the judgment; or denying a motion for a new trial under Rule 59, W.R.C.P."* (Emphasis added.)

Rule 50(b), W.R.C.P., in pertinent part:

"* * * Motions for judgment notwithstanding the verdict shall be determined within sixty (60) days after the entry of the judgment, and if not so determined shall be deemed denied, *unless within such sixty (60) days the determination is continued by order of the court,* but a continuance shall not extend the time to a day more than 90 days from the date of entry of judgment." (Emphasis added.)

Rule 59(f), W.R.C.P.:

"Motions for new trial and motions to alter or amend a judgment *shall* be determined within sixty (60) days after the entry of the judgment, and if not so determined shall be deemed denied, *unless within such sixty (60) days the determination is continued by order of the court* but a continuance shall not extend the time to a day more than 90 days from the date of entry of judgment." (Emphasis added.)

First, let it be noted that nowhere in any of these rules appears any requirement that the order of continuance referred to must be in writing, labeled "continuance" and signed by the district judge, or even so written and signed by anyone else. The only critical requirements are that there be a continuance based upon an order and that the total time from date of judgment for determination not exceed ninety days.

The judgment on the verdict was entered on April 27, 1981. On May 5, 1981, appellants as defendants timely filed their motion for judgment notwithstanding the verdict and motion for new trial or remittitur. That filing under Rules 50(b) and 59(f), W.R.C.P. terminated the running of the time for appeal under Rule 2.01, W.R.A.P. The case had been tried in Douglas, Converse County, Eighth Judicial District, by the district judge, The Honorable Paul T. Liamos, Jr., of the Sixth Judicial District, who resides in Newcastle. Judge Liamos sat on the case by assignment. On May 22, 1981, there was filed in the records of the district court for Converse County and entered in the court's journal, Vol. 26, page 50:

STATE OF WYOMING ) SS  
COUNTY OF CONVERSE )

IN THE DISTRICT COURT

EIGHTH JUDICIAL DISTRICT

NO. __Civil No. 8360__

THOMAS N. RUPE, )  
)  
                    Plaintiff, )  
)  
Vs. )  
)  
RUTH BLAKE and LOUIS DEKMAR, )  
)  
)  
                    Defendants. )

Filed for Record this 22  
day of May A.D. 19 81  
_____  
Clerk of the  
Conver...

NOTICE OF SETTING

PURSUANT TO ORDER made upon __The Court's own Motion__

in the above case, notice is hereby given that __Monday__

the __29__ day of __June__ 19 __81__ at __5:30 P. M.__

has been set for __Hearing of all of Defendants' Motions__

_____ . in said cause. Parties and counsel

will govern themselves accordingly, and copies will be mailed to parties and/or counsel of record in the manner provided by law.

IF A COURT REPORTER is needed for the above setting, counsel should make early arrangements with the appropriate Reporter.

Cases shall not be continued upon stipulation of counsel alone, but such continuances may be allowed by order of the Court. No such continuance shall be allowed except for good cause shown.

DATED this __22__ day of __May__, 19 __81__.

DOCKET ✓  
JUDGMENT  
JOURNAL 2  
PAGE 50

JOAN LORE  
CLERK DISTRICT COURT

by _____  
Deputy

Copies to:  
__Judge Paul T. Liamos, Jr.__  
__Raymond B. Hunkins__  
__Hirst and Applegate__  
__John E. Stanfield__  
Board of County Commissioners

The above record of the order of the court setting the hearing was made prior to expiration of the initial sixty-day limit of Rules 50(b) and 59(f), W.R.C.P. The date set for the hearing was after the sixty days fixed by those rules. On July 10, 1981, still prior to expiration of the ninety-day limit of the same rules, Judge Liamos signed an order denying defendants' post-trial motions. On July 23, 1981, appellants-defendants' notice of appeal was filed within the 15 days from the order of denial as required by Rule 2.01, W.R.A.P.

A full-blown hearing was held at the June 29, 1981 setting of the post-judgment motions. There is no motion by the plaintiff-appellee or any other showing anywhere in the record objecting to the hearing set for that time on the ground that there had been no continuance by order of the court for determination of the motions. The transcript of the hearing on June 29,

1981, fails to disclose the slightest hint that it was irregular as being out of time or not properly continued. The whole atmosphere reflected by the record and hearing by adversary counsel and the trial judge was that if a continuance by order of the court was necessary, it was granted and evidenced by the court through the notice of setting and the conduct of all participants.

Rule 59(f), in the part with which we are concerned, was originally a part of the Code of Civil Procedure, having been enacted by the legislature as chapter 112, Session Laws of Wyoming 1935.[13] The Federal Rules of Civil Procedure contain no such provision. The purpose of such a rule is explained by this court in *Board of Com'rs of Natrona County v. Casper Nat. Bank,* 55 Wyo. 144, 96 P.2d 564 (1939):

"Statutes of this kind in substance have been enacted in a number of States of the Union, and, without undertaking to be exhaustive, we may mention the commonwealths of Montana, California, Oregon, Wisconsin, Arizona, Alabama and Colorado. The enactment of such laws is evidently with the idea of expediting court business and preventing trial judges from keeping motions for new trial under advisement for an unreasonable length of time. Statutes of this character have generally been held to be mandatory. * * *"

While that case dealt with the statute which provided for a stipulation for continuance, it contains a discussion of the subject which gives useful insight into the functions of the rule. In that case this court noted that there was no order of continuance, but the parties appeared and argued a motion for new trial and the court entered an order on the merits after the sixty-day period prescribed by statute. This court further observed that the motion was argued and contested on its merits, and both parties, as well as the court, treated the motion as undisposed of by operation of law. There is more to the case than first meets the eye. It speaks approvingly of precedent from other states with similar statutes or rules that the parties may waive any right to claim a discontinuance of the motion consequent from the absence of an order by appearing and unreservedly contesting the merits of the motion for new trial. By the same token, in the case before us, the parties and the trial court treated the hearing and determination of the motions as continued—and what could be more reasonable! It was further held that denial of such a motion by operation of law is for the benefit of the party who obtained the judgment and may be waived by him by appearance and failure to object. This court likewise approved the following in Board of Com'rs, supra, now rewritten and appearing in 21 C.J.S. Courts § 109, pp. 163–168:[14]

"A want of jurisdiction of the subject matter cannot be waived; but where a court has general jurisdiction of the subject matter a lack of jurisdiction of the particular case may be waived, as may other objections to jurisdiction, such as lack of jurisdiction of the person. An objection, if it can be waived, is waived, among other methods, by invoking, or submitting to, the court's jurisdiction. [Black letter rule.]

"An absolute want of jurisdiction of the subject matter or cause of action cannot be waived, and such jurisdiction cannot be conferred by waiver. Accordingly a

---

13. Chapter 112, S.L.Wyo.1935:
"Motions for new trial shall be determined within sixty days after the rendition of judgment, and if not so determined shall be deemed denied, unless continued by order of the court, or by stipulation."
Continuance by stipulation is not now allowed by the rule.

14. As it appeared in 15 C.J. 845 ¶ 164, quoted in *Board of Com'rs of Natrona County v. Casper Nat. Bank,* 96 P.2d 564 at 569:

"'But, where the court has general jurisdiction of the subject-matter, a lack of jurisdiction of the particular case may be waived by failure to take timely and specific objections, or an invocation of or submission to the jurisdiction may raise an estoppel to deny such jurisdiction. So also the parties may either expressly or by their conduct, waive objections to remedies pursued in courts having jurisdiction of the subject-matter.'"

lack of jurisdiction of the subject matter is not waived by answer, general demurrer, failing to demur, failing to object to, or otherwise raise the question of, jurisdiction, going to trial on the merits, moving for a new trial, appealing, or partially complying with the judgment. Moreover, the objection that the court completely lacks jurisdiction of the subject matter may be raised in any manner.

"*On the other hand, objections to* the venue, *the procedure, including the procedure by which the court acquired jurisdiction of the particular case, or the remedy pursued may be waived,* as may a lack of jurisdiction of the person.

"Where the court has general jurisdiction of the subject matter, a lack of jurisdiction of the particular case, as dependent upon the existence of particular facts, may be waived.

"*What constitutes waiver.* Objections to lack of jurisdiction of the person, and other objections to jurisdiction not based on the contention that there is an absolute want of jurisdiction of the subject matter, are waived by invoking the court's jurisdiction, as by a cross bill or counterclaim, consent, or voluntary submission, to jurisdiction, or conduct amounting to a general appearance, or objecting to the jurisdiction of the subject matter, failing to raise the question of jurisdiction in the proper manner, seeking relief on a ground additional to, or other than, want of jurisdiction, appealing, or by any other conduct indicating an intention to abandon or forego the objection." (Discussion of Rule. Emphasis added and footnotes omitted.)

The dissent overlooks the fact that courts are for litigants as the affected parties. We do not function for the purpose of demonstrating our authority and awesome power to wave a wand and make an appeal disappear, but exist to administer justice to those who come to settle their disputes.

The deadline provisions of Rules 50(b) and 59(f) have served our purpose of expediting litigation. The motions were determined within the limits of the rule. It is not our function to concoct a rule violation, when there is evidence of a continuance not only by conduct but by express order of the district court. The circumstances here are unlike any in cases where we have decided a notice of appeal to be untimely.

There is authority in *Brasel and Sims Construction Co. v. Neuman Transit Co.,* Wyo., 378 P.2d 501 (1963) for finding a continuance in the record. In that case the defendant moved for a new trial under Rule 59(f) [15] and later moved for an extension of time *for determination of the motion* to August 23. The motion was argued on August 21, taken under advisement by the district judge but was not *determined* until October 11 by entry of an order overruling the motion. The *determination* was only continued to August 23 but this court said: "In the instant situation both court and counsel at the time of the hearing of the motion apparently proceeded as if the continuance was to be effective until the matter was resolved by the trial court. Accordingly, the motion to dismiss [in the supreme court] must be overruled." That is exactly what occurred in the case before us—the court and counsel proceeded as if a continuance had been granted, even if it had not.

This court, by *In re Potter's Estate,* Wyo., 396 P.2d 438 (1964), held that there may be an implied continuance under Rule 59(f), supra, by the action of the trial judge in permitting delay in entry of an order overruling a motion for new trial. He thus manifests an intent to continue determination of the motion.

In *Brasel,* supra, this court also noted that there was a lack of clarity of Rule 59(f), W.R.C.P. in such a situation. There is also a lack of clarity in Rules 50(b) and 59(f), W.R.C.P. as to what to do in the

---

**15.** Rule 59(f), W.R.C.P. at that time provided: "Motions for new trial shall be determined within sixty days after the entry of the judgment, and if not so determined shall be deemed denied, unless within such sixty days the determination is continued by order of the court or by stipulation."

As with the transplanted statute, fn.13, continuance by stipulation is not allowed.

appeal now before us under the circumstances. We do as this court did in both *Board of Com'rs* and *Brasel*—proceed as did the trial judge and counsel on the basis that there was an effective continuance of the determination. The case at bar is stronger than either of those cases because there is present here a notice of setting evidencing an order of the court continuing the matter to meet his convenience as a visiting judge.

Rather recently this court has refused to dismiss an appeal because of lack of clarity in the applicable rule. In *Downs v. State,* Wyo., 581 P.2d 610 (1978), this court refused to dismiss an appeal even though this court itself had raised the question of timeliness of the notice of appeal, stating that "[b]efore we will dismiss an appeal for failure to file a timely notice of appeal, there must be clear grounds for doing so." It is judicially unbecoming to set traps for trial judges and counsel, and we should not construe our rules to reach that result.

■ What is a continuance? Black's Law Dictionary (1979) defines it: "*Continuance.* The adjournment or postponement of a session, hearing, trial, or other proceeding to a subsequent day or time. Also the entry of a continuance made upon the record of the court, for the purpose of formally evidencing the postponement, or of connecting the parts of the record so as to make one continuous whole." Ballentine's Law Dictionary (1948): "*continuance.* An adjournment of a cause from one day to another, which may be in the same or in a later term, although the word 'postponement' is preferable where a trial or hearing is delayed only until a later day of the same term, or until a later hour of the same day." Webster, Third International: "*Continuance.* * * * 5: the adjournment of the court proceedings in a case to a future day; also: the entry of such adjournment and the grounds thereof on the record." Continuance is the postponement of an action pending in a court to a subsequent day. *Ferber v. Brueckl,* 322 Mo. 892, 17 S.W.2d 524, 527 (1929). A continuance generally means only that the date of hearing is postponed. It does not affect the merits of

a case; it leaves all matters as they were before, except that the time is changed. *McKinney v. Hirstine,* 257 Iowa 395, 131 N.W.2d 823, 825 (1964). Substance must prevail over mere form, and postponement of court action is a continuance whether or not it is so labeled. *Simakis v. District Court of Fifth Judicial for Eagle Cty.,* 194 Colo. 436, 577 P.2d 3, 5 (1978).

Other states, where similar code procedure or court rules provide deadlines for disposing of post-trial motions, have no problems finding continuances from the circumstances. In *Patch v. Buros,* 2 Ariz.App. 585, 410 P.2d 703 (1966), the Arizona Rule of Civil Procedure 59(e), tracking the same numbering system as our rules, provides that "[m]otions for new trial shall be determined within twenty days after rendition of judgment, and if not so determined shall be deemed denied, unless continued by order of the court, or by stipulation." The trial court took the motion under advisement and entered in its minutes, "ORDER taking * * * Motion for New Trial under advisement." It was held that the order taking the motion under advisement is an "order of the court" by which a motion for new trial may be "continued." *Patch* cited *Zugsmith v. Mullins,* 81 Ariz. 185, 303 P.2d 261 (1956) by which the supreme court of Arizona set the pace for such a resolution by holding that an order taking the case under advisement is in effect an order of continuance contemplated by the rule and the trial court did not lose jurisdiction to rule on the motion.

In *Palmer v. Quinn-Robbins Co.,* 52 Idaho 661, 18 P.2d 917 (1933) it was held that since a motion for new trial could not be heard until specifications of error and particulars touching alleged errors were filed, an order extending the time for filing those items necessarily had the legal effect of extending the time for hearing the motion.

In *State ex rel. Portykus v. Schinz,* 176 Wis. 646, 187 N.W. 743 (1922), it was contended that there was no valid continuance of a motion for new trial because there was no written order but the court held that an oral order actually made became the order

of the court as effectively as though entered in writing.

In *Ex Parte Schoel*, 205 Ala. 248, 87 So. 801 (1921), it was held that by appearing and unreservedly contesting the motion for new trial, the plaintiff waived any right to claim a discontinuance consequent upon the absence of effective orders of continuance of the motion even though the orders had been made orally from the bench. The court went on to hold that the entry of record is no more than a ministerial performance as a memorial of the judicial pronouncement.

See also *Britton v. Burlington Northern, Inc.*, Mont., 601 P.2d 1192 (1979) where under Montana's Rule 59(d), M.R.Civ.P.[16] the court said it would be "unconscionable" to not consider that a motion for extension of time to file a brief in support of motion for new trial "by necessary implication" extended the time for its ruling on the motion. Montana's M.R.App.Civ.P., Rule 5, is practically identical to our Rule 2.01, W.R.A.P. tolling the time for notice of appeal when a motion for new trial is filed.

The clerk of the district court in issuing the notice of hearing was conveying to counsel the order of the court (the assigned district judge) that he was holding in status quo all proceedings in the case and postponing (continuing) the determination of the motions, until a hearing could be held. His order to the clerk and the notice of setting were prior to expiration of the initial sixty-day limitation of Rules 50(b) and 59(f), and

the date set for the hearing was within the ninety-day maximum for determination, at the end of which period would be discontinuance of the court's jurisdiction to act.

The clerk of the district court in doing so was carrying out her duties prescribed by § 5–3–202, W.S.1977:

"* * * He [she] shall attend upon the terms of court held in the county for which he [she] is elected, *and perform such duties relating to his [her] office as may be required of him [her] by the court, and shall perform all such other duties relating to his [her] office as are required of him [her] by law or the rules and practice of the courts.*" (Emphasis added.)

The notice reflecting that there was a continuance by order of the court is evidenced by the fact that Judge Liamos was present and appeared in the courtroom at the time designated (the setting was for 5:30 p. m. but the transcript showed the proceeding as starting at 6:00 p. m.). The court announced:

"THE COURT: Court's in session in Civil Action # 8360, Thomas N. Rupe against the Board of County Commissioners of the County of Converse, et al.

"We have several motions that have been filed by the defendants and, Mr. Parker, are you ready to proceed, sir?"

The parties certainly treated the notice of setting as an order of the court because both sides filed preargument briefs and were present in accordance with the direction of the notice.

**16.** Rule 59(d), M.R.Civ.P.:

"Hearing on the motion shall be had within 10 days after it has been served, or within 10 days after the party opposing the motion for new trial has served his affidavits as set forth in subparagraph (c) hereinabove except that at any time after the notice of hearing on the motion has been served the court may issue an order *continuing the hearing for not to exceed 30 days.* In case the hearing is continued by the court, it shall be the duty of the court to hear the same at the earliest practicable date thereafter, and the court shall rule upon and decide the motion within 15 days after the same is submitted. If the court shall fail to rule upon the motion within said time, the motion shall, at the expiration of said period, be deemed denied.

"The decision on the motion may be entered in the minutes of the court, or may be made in writing in chambers or in any county in the state where the judge may be, and be filed with the clerk of court in the county where the action is pending. Upon the hearing, reference may be had in all cases to the pleadings and the orders of the court on file, and reference may also be had to any depositions and documentary evidence offered on the trial, and to the proceedings on the trial and, when necessary, reference may be had to the notes of the court reporter.

"If the motion is not noticed up for hearing and no hearing is held thereon, it shall be deemed denied as of the expiration of the period of time within which hearing is required to be held under this Rule 59."

The clerk performed a "dut[y] * * * required * * * by the court." The clerk, the judge, counsel for the plaintiff and counsel for the defendants all responded in such a fashion that the procedures followed as a "practice of the court." The notice was on a printed form, further evidence of an established practice expected and followed by the bar.

It would be astonishing· that anyone would even imagine that the clerk of court was undertaking to act like a judge or usurp any power of the court rather than performing a ministerial duty. The notice of hearing was an affirmative record memorializing an action by the trial court. There is no doubt that if the parties had treated the notice as some frivolous, unauthorized action by the clerk, that would have appeared in the record and the notice of appeal would have then justifiably been untimely.

In *State v. Dickson*, 53 Wis.2d 532, 193 N.W.2d 17 (1972), cited in the dissent, the clerk's "order" did not indicate that it was issued as an order of the court as here where the clerk in the notice made it clear that she was only carrying out the order of the district judge on his own motion. Furthermore, the *Dickson* case was an appeal from action of a judge holding an attorney and his client in contempt for the attorney's action in calling on the judge in his chambers and advising the judge that he had authority to appear for his client and that he would not have his client present at a pretrial hearing in the criminal case. The real gist of this case was not the notice but the unlawful action of the trial judge in requiring the criminal defendant to be present at a pretrial conference when there is no such requirement in Wisconsin.

There is no element of waiver in that case and the order of the clerk of court was only held not to be "an order of the court in the sense used in legal procedures." The

notice in the present case does not purport to be an order but only transmits the order of the court itself and conveys an order in the sense used in legal procedures.

*Toulon v. Nagle*, 67 Wis.2d 233, 226 N.W.2d 480 (1975), cited by the dissent, is likewise not in point. The court held the appeal untimely because the notice sent by the clerk *did not recite* that the extension of time was by order of the court. The order in the case before us recites that the notice was by order of the court. The court further held that the extension was not granted for cause "as required by sec. 270.-49, Stats." [17] We have no similar statute or rule requiring an extension of determination for cause. The circumstances are not comparable. In passing, it is noted that the Wisconsin court did go ahead and decide that the new trial should be granted because it can exercise its discretion and grant a "new trial in the interest of justice."

If those authorities are representative as stated by the dissent, then there is no authority for the position of the dissent. The overwhelming position of the courts of other states is that a continuance may be implied from the circumstances. Nor is there any analogy in *Bertagnolli v. Bertagnolli*, 23 Wyo. 228, 148 P. 374 (1915), where the clerk entered a default judgment in the face of a late-filed demurrer. This court only held that the clerk could not do that. Nor does *Kimbel v. Osborn*, 61 Wyo. 89, 156 P.2d 279, 158 A.L.R. 1079 (1945) have any application since it simply holds that the statute was not followed in entering a default judgment. The key holding of importance in those cases is from *Bertagnolli*; and that is, in entry of a default judgment, the clerk must follow the statute. In the present case, though not a default judgment case, the clerk did follow the statute. She did as directed by the district judge and

17. The Wisconsin statutes, § 270.49, then in effect, provided:

"(1) A party may move to set aside a verdict and for a new trial because of errors in the trial or because the verdict is contrary to law or to the evidence, or for excessive or inade-

quate damages or in the interest of justice; but such motion must be made and heard within 2 months after the verdict is rendered, *unless the court by order made before its expiration extends such time for cause. * * *"* (Emphasis added.)

issued a notice that he had ordered a hearing in accordance with court practice. There is no question of the clerk exceeding her authority, taking off on some frolic of her own, or undertaking to play judge. She exercised no discretion.

It is for these reasons the court found the notice of appeal timely and proceeded to decide the appeal on its merits.

Reversed and remanded with directions to vacate the judgment in favor of appellee Rupe and enter judgment for appellants Blake and Dekmar.

ROONEY, Justice, concurring.

I concur. Inasmuch as many of those discharged from the penitentiary received certificates of discharge containing the same or similar language to that contained in Rupe's certificate, I want to set forth my belief as to the effect of them and the effect of § 7–13–107, W.S.1977,[1] pursuant to which the certificates were worded. Insofar as such section provided that the governor *shall* issue a certificate for discharge to convicts which *shall* restore "his rights the same as though a full pardon had been granted," it was unconstitutional; and any recitation pursuant thereto contained in the form for a certificate of discharge which provides for a restoration of civil rights had no force or effect in law.

The power to pardon is in the governor, and only in the governor, as chief executive of the state. Art. 4, § 5, of the Wyoming Constitution reads in pertinent part:

"The governor shall have power to remit fines and forfeitures, to grant reprieves, commutations and pardons after conviction, for all offenses except treason and cases of impeachment; but the legislature may by law regulate the manner in which the remission of fines, pardons, commutations and reprieves may be applied for. * * * "

Section 7–13–107 did not leave the discretion to grant pardons in the governor. It did not "regulate the manner in which * * * pardons * * * may be applied for." It amounted to a legislative grant of pardon. The legislature could not constitutionally do so.

"The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." Art. 2, § 1, Wyoming Constitution.

The legislature has regulated the manner in which "pardons may be applied for." See §§ 7–13–801 through 7–13–806, W.S. 1977. Such has been held to not limit the discretion of the governor in granting pardons. *In re Moore,* 4 Wyo. 98, 31 P. 980 (1893). Appellee was not pardoned pursuant to the provisions of these sections. The pardon allegedly arising from the certificate of discharge was without an exercise of discretion by the governor and was therefore invalid.

With respect to the dissent of Chief Justice Rose, I do not believe, as stated therein, that we have departed from our standard policy of dismissing appeals when the notice of appeal is not timely filed. Although an "order of continuance" is not in the record, I am persuaded that there is sufficient record reflection of the existence of an order setting the matter for hearing, and that such order is sufficient to satisfy the requirement of Rule 59(f), W.R.C.P.,[2] i.e., it was sufficient to indicate that the "determination" of appellant's motions was "continued by order of the court."

With reference to the existence of an order setting the matter for hearing, the majority opinion notes that there is no requirement that the order be in writing or labeled "continuance." The record contains

---

1. See majority opinion for provisions of § 7–13–107, W.S.1977, prior to May 1981 and see fn. 2 of that opinion for provisions thereof after May 1981.

2. See fn. 1 of Chief Justice Rose's dissenting opinion for content of Rule 59(f), W.R.C.P.

a notice of setting which begins: *"Pursuant to order* made upon the Court's own Motion * * * "* (emphasis added). The notice emanates from the office of the clerk of court. It is signed by her, and copies were directed to the attorneys for all of the parties. The order referred to in the notice is not in the record.

Many orders and rulings of the trial courts are made orally. The better practice is to either make such in writing or have them recorded as a part of a verbatim transcript of proceedings. However, there are other approved methods to establish that which occurred during the proceedings and progress of a case, e.g., Rules 4.03 and 4.04, W.R.A.P., relative to the state of evidence or proceedings when no report was made or the transcript is unavailable and when correction or modification of the record is necessary.[3] The recitation of the existence of an order by the clerk of court, as here done in the notice of setting, is sufficient evidence of the fact of such order.

In *Murry v. State,* Wyo., 631 P.2d 26, 28 (1981), we noted the potential of an oral order, although its existence was not pertinent to the resolution of that case, and its existence was there evidenced by a statement of proceedings supplementing the record. It was said in an early case involving a criminal contempt of court:

"Undoubtedly, in judicial proceedings, an 'order,' as contradistinguished from a 'judgment,' is often defined as one reduced to writing, and entered in the records of the court; and such is the purport of many of the cases referred to by counsel for the defendant. But that is by no means saying that such only is an order. There must, in the nature of things, be an

order of a court made before it is, or can be, written out in the records of the court by the clerk. When written out, the writing becomes a record of the order, and is evidence of it. Orders are almost daily given to the marshal concerning matters to be performed in the presence of the court, and they are as constantly executed before being written out. Indeed, many of them are never reduced to writing at all. Yet there can be no doubt of their validity. Now, the language of the statute in question is broad enough to include all valid oral orders. The natural, ordinary meaning of the word includes written, as well as unwritten, orders, and there is no reason in the policy of the law, or in the nature of things, for excluding unwritten orders. Indeed, the contrary is true. There is just as much reason and necessity for making it an offense to resist the execution of a lawful unwritten order, brought distinctly and authoritatively to the notice of the offending party, as for making it an offense to resist the execution of one in writing. * * * " *United States v. Terry,* 9 Cir., 41 F. 771, 773–774 (1890).

And in a recent case:

"* * * An 'order of a court' may be oral, as in *Comm. of Pennsylvania v. Local Union 542, (Appeal of Freedman),* 552 F.2d 498 (CA 3, 1977). It may be a paper, bearing the word 'ORDER', signed by a judge or other judicial officer. Or it may be a subpoena, writ of execution or other process." *In Re Grand Jury Proceedings,* 503 F.Supp. 9, 12 (1980).

"* * * An order of judgment is the decision of the court. It may be formulated in writing by the judge, or declared by

**3.** Although I do not base my determination thereon, Rule 60(a), W.R.C.P., and Rule 37, W.R.Cr.P., are of interest. Rule 60(a), W.R.C.P., provides:

"* * * Clerical mistakes in judgments, orders or other parts of the record *and errors therein arising from oversight or omission* may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected

before the appeal is docketed in the Supreme Court, and thereafter while the appeal is pending may be so corrected with leave of the Supreme Court." (Emphasis added.)

Rule 37, W.R.Cr.P., provides:

"Clerical mistakes in judgments, orders or other parts of the record *and errors in the record arising from oversight or omission* may be corrected by the court at any time and after such notice, if any, as the court orders." (Emphasis added.)

him orally. In the latter event the duty rests upon the clerk to write the substance upon his records. That was done in this case, and thereupon the order became entered as completely as if written out by the judge himself and signed by him. * * * " *Allen v. Voje,* 114 Wis. 1, 89 N.W. 924, 926 (1902).

The fact of an existence of an oral order together with its import must be determined on a case by case basis. In this case, the recitation of the fact of the order by the clerk of court and the fact that it set a hearing on appellant's motions for June 29, 1981, at 5:30 p. m. are without question. The integrity of the clerk's recordation should be equal to that of a reporter's transcript.

With reference to the second aspect of the issue, i.e., whether or not the order setting the motions for trial at a date beyond the initial 60 days allowed by Rule 59(f), W.R.C.P., is sufficient to continue the determination of the motions into the extended 30-day period, the purpose behind the entire time table is important. The time table itself, insofar as this case is concerned, is as follows:

1. Notice of appeal must be filed within 15 days from the entry of the judgment or final order appealed from per Rule 2.01, W.R.A.P., and such filing is jurisdictional per Rule 1.02, W.R.A.P.

2. The running of the time in which to file a notice of appeal is terminated if a timely motion for a new trial is filed (as here) per Rule 2.01, W.R.A.P.

3. The motion for a new trial shall be "determined" within 60 days after entry of the judgment unless "the determination is continued by order of the court" per Rule 59(f), W.R.C.P.

The purpose for setting a mandatory and jurisdictional time within which a notice of appeal must be filed is:

"* * * to set a definite point of time when litigation shall be at an end, unless within that time the prescribed application has been made; and if it has not, to advise prospective appellees that they are freed of appellant's demands. * * * " *Matton Steamboat Co. v. Murphy,* 319 U.S. 412, 415, 63 S.Ct. 1126, 1128, 87 L.Ed. 1483 (1943).

The purpose in terminating the running of the time in which to file an appeal when a timely motion for a new trial has been filed is set forth in *Browder v. Director, Department of Corrections of Illinois,* 434 U.S. 257, 98 S.Ct. 556, 562, 54 L.Ed.2d 521 (1978), reh. denied 434 U.S. 1089, 98 S.Ct. 1286, 55 L.Ed.2d 795 (1978):

"* * * The rationale behind the tolling principle of the Rule is the same as in traditional practice: 'A *timely* petition for rehearing tolls the running of the [appeal] period because it operates to suspend the finality of the . . . court's judgment, pending the court's further determination whether the judgment should be modified so as to alter its adjudication of the rights of the parties.' *Department of Banking v. Pink,* 317 U.S. 264, 266, 63 S.Ct. 233, 234, 87 L.Ed. 254 (1942) (emphasis supplied). * * * "

The purpose in setting a time for determination of the motion for a new trial is the same as that for setting a time in which to file a notice of appeal.

Inasmuch as the purpose in terminating the time in which to file an appeal is to suspend the finality of the judgment, it would seem that an order setting a date for a hearing beyond the original 60-day limit, but within the authorized additional 30 days would be of equal notice and force to suspend the finality of the judgment until the hearing date "pending the court's further determination whether the judgment should be modified" as would an order captioned "continuance."

That such was taken to be so by the trial court and all of the parties is evidenced by the fact that the hearing was actually held at the time set, with the judge and all parties in attendance and participating, and with appellee making no objection to such hearing.[4] See the majority opinion for an elaboration of this point.

4. Although Rule 59(f), W.R.C.P., then contained an additional provision relative to con-

The language of Rule 59(f), W.R.C.P., does not specify any particular kind of an order to accomplish the continuation. It provides that the purpose of the order is to continue the "determination" of the matter. If the hearing on the motion for a new trial were held before the expiration of the initial 60 days, but the court had not completed its research or perhaps it had ordered briefs which were not yet due, the usual order continuing a hearing would not be proper. An order reflecting the fact of the hearing and that the matter was taken under advisement or an order setting time for briefs or some similar order should be sufficient to continue the "determination" and extend the time for filing a notice of appeal. An order setting a time for the hearing itself should also be sufficient for such purpose.

Generally, the proceedings and actions of the trial court are presumed to be regular and proper. *O'Malley v. Eagan,* 43 Wyo. 233, 2 P.2d 1063, reh. denied 43 Wyo. 350, 5 P.2d 276, 77 A.L.R. 582 (1931). I find nothing in this record to overcome that presumption. There was an order of the court setting a hearing on the motion for a new trial at a date beyond the initial 60-day limit contained in Rule 59(f), W.R.C.P. The order continued the "determination" of the motions. The notice of appeal was timely filed.

I submit the foregoing as additional grounds for the holding of the majority opinion.

THOMAS, Justice, concurring and dissenting.

If the issue on the merits in this case is before the court for disposition, then I agree entirely with the disposition made of that issue by the majority opinion. I am persuaded that it is necessary in our society that the prosecutive discretion of a county attorney should not be inhibited by the potential of civil action in those cases in which convictions are not obtained.

I must dissent, however, from the conclusion that this court had jurisdiction in this appeal. We long have followed the rule that the timely filing of a notice of appeal is essential to vest this court with jurisdiction. We have ameliorated the strictness of that rule, however, by now providing in Rule 2.01, W.R.A.P., that:

"A notice of appeal, in a civil or criminal case, filed prematurely shall be treated as filed on the same day as entry of judgment or final order, provided it complies with Rule 2.02, W.R.A.P."

In this case the judgment became final 60 days after the filing of the motion which sought relief under Rules 50(b) and 59(f), W.R.C.P., "unless within such sixty (60) days the determination is continued by order of the court." Rule 50(b) and Rule 59(f), W.R.C.P. I am not persuaded that a Notice of Setting such as that entered in this case is a continuance by order of the court. On its face it is nothing more than a calendaring order which could be entered by the clerk of the district court upon advice from the visiting judge as to the dates that he would be available. Certainly the docket entries in this case do not reflect any oral order of the court which could serve as a basis for concluding that there was any continuance intended.

A legal fiction is an "Assumption of fact made by court as basis for deciding a legal question. A situation contrived by the law to permit a court to dispose of a matter, though it need not be created improperly; e.g. fiction of lost grant as basis for title by adverse possession." Black's Law Dictionary, p. 804 (5th Ed. 1979). I am satisfied that in this instance the majority has structured a legal fiction to permit the significant issue on the merits to be reached. In so doing the effect of an amendment of this rule to take away the power of the parties to stipulate to the extension of time for

---

tinuation by stipulation, we said, in overruling a motion to dismiss for failure to file a timely notice of appeal, that "both court and counsel at the time of the hearing of the motion apparently proceeded as if the continuance was to be

effective until the matter was resolved by the trial court." *Brasel & Sims Construction Co. v. Neuman Transit Co.,* Wyo., 378 P.2d 501, 503 (1963).

disposition of such a motion either forthrightly or by inference has been sidestepped very neatly.

I regret that the district courts have been encouraged by this decision to not deal definitively with such matters. While perhaps some responsibility must be cast upon counsel to be sure that their appeals are not lost through inadvertence, in the efficient administration of the business of the court the district judge has a responsibility for either disposing of such motions or entering a clear order continuing the disposition for not more than 30 days. It occurs to me that, based upon the state of the visiting judge's calendar, the clerk in this instance could have as easily set the hearing for some day more than 90 days after the filing of the motion, and I do not believe that a legal fiction could have been developed to save the matter in that instance. I do agree with Chief Justice Rose's thought that the continuance of the disposition of such a motion is a matter of judicial discretion which should not in any manner be delegated to the office of the clerk of the district court.

I do have another regret which I will state. During the years that I have been privileged to serve on this court we previously have dismissed appeals because of an untimely notice in circumstances very similar to and certainly analogous to these. I would suppose that every one of those appeals could have been saved by the imposition of some style of legal fiction similar to that invoked here. Yet, if our rules of procedure are sufficiently plastic to permit their adjustment by the imposition of legal fictions then it seems to me they become guidelines only, not rules. As such, their utility would be substantially undermined.

ROSE, Chief Justice, dissenting.

Had I been writing for the majority, I would have found that this court does not have jurisdiction to entertain this appeal and therefore would have affirmed.

Following the perfection of the appeal in this case, we discovered a possible jurisdictional defect, and, at oral argument, we asked the parties to submit additional briefs addressing our concerns. Given the provisions of Rule 59(f), W.R.C.P.,[1] we questioned whether the appellant's notice of appeal was timely. The following describes the sequence of events that gives rise to the problem:

| | |
|---|---|
| Judgment Entered | 4–27–81 |
| Rule 59 Motion Filed | 5–05–81 |
| Notice of Setting For | 5–22–81 |
| Hearing on Motion [2] | (set for 6–29–81) |
| Rule 60 Motion Filed | 6–22–81 |
| Hearing on Motions | 6–29–81 |
| Order Denying Motions Entered | 7–10–81 |
| Notice of Appeal Filed | 7–23–81 |

According to Rule 59(f), W.R.C.P., motions for new trial are deemed denied if not decided within 60 days of the entry of the judgment, unless a continuance is granted *"by order of the court"* (emphasis added) allowing as much as an additional 30 days within which to determine the issue raised by the motion. Under this rule, appellant's motion for a new trial must be deemed denied by operation of law on June 26, 1981, unless the clerk of court's "Notice of Setting", which set the date for hearing argument upon the Rule 59 new trial and Rule 60(b) motions three days past the June 26 date, amounted to an "order of the court" granting the permitted extension for ruling on the motion for a new trial. If this is the effect of the clerk's "Notice of Setting",

1. The operative language of Rule 59(f), W.R.C.P. is:

"Motions for new trial or to alter or amend a judgment; time limit.—Motions for new trial and motions to alter or amend a judgment *shall* be determined within sixty (60) days after the entry of the judgment, and if not so determined shall be deemed denied, *unless* within such sixty (60) days the determination is continued by *order of the court* but a continuance shall not extend the time to a

day more than 90 days from the date of entry of judgment." (Emphasis added.)

2. The record reflects the following Notice of Setting entry by the clerk of court:

"PURSUANT TO ORDER made upon *The Court's own Motion* in the above case, notice is hereby given that *Monday* the *29* day of *June 1981* at *5:30 P.M.* has been set for *Hearing of all of Defendants' Motions,* * * *."

then appellant's appeal from the judgment was timely filed. If this is not the effect of the clerk's entry, then the notice of appeal was late and this court lacks jurisdiction to consider the appeal on its merits.[3]

We are faced with this dilemma: In order to hold for the appellant's position that the "Notice of Setting" is sufficient to comply with the 59(f) time-extension provision, we must be able to say:

1. The "Notice of Setting" for hearing argument on appellant's motion for a new trial is actually an order extending the time limitation within which the court can decide the motion for a new trial under Rule 59(f), and

2. If that is what the "Notice of Setting" really is—an order extending the time within which the court will be permitted to decide the motion for a new trial—then we must be able to decide that the clerk of the court has the power and authority to make and enter such an order, i.e.,—assuming, arguendo, the "Notice of Setting" was made on the court's motion and was intended to serve as an order extending the time within which the court could decide the motion for a new trial under 59(f), we must then ask whether the clerk of court's "Notice of Setting" can be said to be an "order of the court" as required by Rule 59(f).

My review of the question forces me to conclude that the clerk of court's "Notice of Setting" did not and could not have the effect of granting the extension contemplated by the provisions of Rule 59(f). This means that, under our rules and opinions interpreting them, we cannot reach any issues on appeal except that which concerns the trial courts denial of appellant's Rule 60(b) motion.[4]

As noted earlier, Rule 59(f), W.R.C.P. authorizes the granting of a continuance of up to 30 days past the original 60 days from the entry of judgment during which additional time the trial court is permitted to rule on the motion. The language of the rule makes clear that the extension can only be granted by "order of the court." In other words, the extension-granting decision is a discretionary matter with the court. The purpose of subdivision (f) of Rule 59 is to expedite court business, and to insure the finality of judgments. See a discussion of this subject in *Board of Commissioners v. Casper National Bank,* 55 Wyo. 144, 96 P.2d 564 (1939), rev. on other grounds, 105 P.2d 578 (1940). We have held that the provisions of subdivision (f) are jurisdictional and the extension requirements must be complied with or the judgment becomes final at the end of 60 days. Furthermore, a written order by the court cannot extend the time limitation after the motion has been deemed denied by operation of law. *Johnson v. Hauffe,* Wyo., 567 P.2d 735 (1977); *McMullen v. McMullen,* Wyo., 559 P.2d 37 (1977); *Sun Land &*

**3.** We said in *Rutledge v. VonFeldt,* Wyo., 564 P.2d 350 at 351–352:

"Without a timely notice of appeal from the judgment, we are without jurisdiction. *Jackson v. State,* Wyo., 547 P.2d 1203; *Wyoming Farm Bureau Mutual Insurance Company v. Vannelli,* Wyo., 370 P.2d 738; *Spencer v. Pringle,* 51 Wyo. 352, 67 P.2d 204; *Fertile Valley Canal Co. v. Kearney,* 37 Wyo. 475, 263 P. 620; *Culbertson v. Ainsworth,* 26 Wyo. 214, 181 P. 418; *Hahn v. Citizens' State Bank,* 25 Wyo. 467, 171 P. 889, reh. den. 25 Wyo. 467, 172 P.2d 705; *Financial Management Corp. v. Wyoming Electric Sign Co.,* supra; *Bosler v. Morad,* Wyo., 555 P.2d 567; *Bard Ranch Inc. v. Weber,* Wyo., 538 P.2d 24, reh. den., *Matter of Final Proofs of Appropriation of Following Water Rights,* Wyo., 541 P.2d 791; and *Bowman v. Worland School Dist.,* Wyo., 531 P.2d 889.

"Even though these jurisdictional deficiencies were not called to our attention by the parties, it was, nevertheless, our unhappy obligation to call them up ourselves. *Jackson v. State,* supra, and authorities therein contained."

**4.** The Rule 60(b) issue is before us since an order on this motion is final and appealable. However, Rule 60(b) motions do not extend the time limit for appeal, and appellants are thereby precluded from attacking the underlying judgment. Thus, any issues involving the merits of this case were not preserved for our review by reason of the 60(b) motion. See: *McBride v. McBride,* Wyo., 598 P.2d 814 (1979); *Kennedy v. Kennedy,* Wyo., 483 P.2d 516 (1971).

*Cattle Co. v. Brown,* Wyo., 387 P.2d 1004 (1964).[5]

*Is a "Notice of Setting" an order—and if it is an order, is it an order extending time within which to decide the motion for a new trial—or is it an order setting the time for argument on the motion—or is it both?*

I have heretofore noted the entry made by the clerk of the court at n.2, supra. On its face, the clerk's entry purports to set the motion hearing beyond the 60-day deadline conceived by Rule 59(f). Other than this, the record reflects no action by the trial judge with respect to the granting or denying of an extension of time within which to rule on appellant's new-trial motion. Nothing in the record verifies the notion that the "Notice of Setting" extending the time past the 60-day limit was entered by authority of the trial judge. Even if it could be shown that the "Notice of Setting" has been entered by the clerk upon the motion of the trial judge, there is still no record indication that the entry was intended to be an order extending the time within which the motion for a new trial could be decided as contemplated by Rule 59(f). It certainly does not say that this is what the person who authorized the writing intended. All the "Notice of Setting" says is that the argument on the motion for a new trial will be heard by the court on the 29th of June, 1981, at 5:30 p. m. It appears to be a ministerial entry by the clerk of the court—perhaps at the behest of the judge—telling attorneys when the judge will be available to hear arguments on the motions. It does not purport to say—at least on its face—that the judge has exercised his discretion with respect to whether or not he will extend the time within which he will make a decision on the granting or denial of a new-trial motion.

For the judge to say to the clerk of court, "Tell the lawyers to be here next Tuesday to argue their motions,"

seems to indeed impose upon the clerk a ministerial task. But should the judge say to the clerk,

"You decide whether or not we should grant the appellant additional time within which the motion for a new trial will be heard, failing which it will be deemed denied,"—

this sounds like the clerk is being delegated the court's discretion.

In view of the authorities that I will refer to hereafter, it must be assumed that the entry by the clerk was a ministerial task and did not—because it could not—involve judicial discretion. This assumption leads to the conclusion that the entry was what it appears to be—a ministerial act which told lawyers when to appear to argue the motions and was not an exercise of such judicial discretion as would be necessary in deciding whether or not the court would grant a motion to extend the time for deciding the new-trial issue under Rule 59(f).

*If the clerk's entry is an order extending the time for purposes of Rule 59(f), is it an "order of the court"—or is it just a clerk's order? And if it is the former is the clerk authorized to make such an order?*

Various Wyoming statutes describe the duties of clerks of court, none of which suggest that a clerk has the power to issue orders of the court. Section 5–3–202, W.S. 1977 describes the duties of a district court clerk as follows:

"Each clerk of the district court shall keep and make up the records and books of the court of his particular county, receive all cases filed therein, properly record and attend to the same, and shall have the care and custody of all the records, seal, books, papers and property pertaining to his said office or the court of the county for which he is elected and which may be filed or deposited therein, and shall receive, account for and pay over all money that may come into pos-

---

5. It is important to note that the cases above dealt with Rule 59 or its progeny, when the rule provided not only that an extension could be granted by order of the court, but also by stipulation of the parties. Under the present Rule 59 structure, an extension can only be granted by order of the court. (Amendment, April 12, 1978.)

session of the court according to law, and under the orders or decrees of the court, * * *."

Section 5–7–101, W.S.1977 states in general terms:

"The clerk of each of the courts shall exercise the powers conferred and perform the duties enjoined upon him by statute and by the common law; and in the performance of his duties he shall be under the direction of his court."

These statutes clearly contemplate that the function served by a clerk of court is that of an administrative officer of the court whose duty it is to perform ministerial tasks.

The general rule is said to be:

"In as much as a clerk of court is essentially a ministerial officer, as is stated in § 1 of this Title, *he cannot*, without express constitutional or statutory authority to that effect, *exercise any judicial functions, and the court, it has been held, has no power, in the absence of statutory authority, to delegate such matters to the clerk,* although the clerk may properly perform acts which are classified as ministerial." (Emphasis added.) 14 C.J.S. Clerks of Court, § 35.

The rule was reiterated in *Corbin v. State ex rel. Slaughter,* Fla.App., 324 S.2d 203 (1975), where the court held a clerk of court is a ministerial officer who does not exercise discretion in performing most of his services. This general rule regarding the powers and the functions of the clerk of court has been reiterated in numerous cases. For example, in *Sabbe v. Wayne County,* 322 Mich. 501, 33 N.W.2d 921 (1948) the court said:

"We have held that the duties and functions of county clerks are purely ministerial and that judicial functions cannot be performed by court clerks, nor may the power to do so be conferred upon them. *People v. Colleton,* 59 Mich. 573, 26 N.W. 771; *Wilson v. Genesee Circuit Judge,* 87 Mich. 493, 49 N.W. 869, 24 Am.St.Rep. 173; *Toms v. Recorder's Court Judge,* 237 Mich. 413, 212 N.W. 69." 33 N.W.2d at 922.

See also, *Bertagnolli Bros. v. Bertagnolli,* 23 Wyo. 228, 148 P. 374 (1915) and *Kimbel v. Osborn,* 61 Wyo. 89, 156 P.2d 279 (1945).

*What is an "order of the court"?*

It has been said:

"An 'order of court' has been defined as one made in open court by a judge of the court who is present at the place designated for the transaction of judicial business and there assumes to transact such business. A 'judge's order' has been defined as one made by a judge at chambers or out of court. Under some statutes the distinction between court orders and judge's orders has been abolished, at least with respect to certain courts." (Footnotes omitted.) 60 C.J.S. Motions and Orders, § 2(b).

Another definition says:

"An 'order' of a court has been defined as the judgment or conlusion [sic] of a court by which affirmative relief is granted or denied on a motion or a special proceeding. The word has been defined at greater length as a decision made during the progress of a cause, either before or after final judgment, settling some point of practice or some question collateral to the main issue presented by the pleadings that must be disposed of before the main issue can be passed on by the court or that must be determined for the purpose of carrying into execution the final judgment. Although 'order' has been statutorily defined as being every direction of a court or judge made in writing and not included in a judgment, the word ordinarily connotes not only an order reduced to writing but also any verbal command, direction, order of the court made during the course of a trial." 56 Am.Jur.2d, Motions, Rules, and Orders § 3 (1971) and the cases cited therein.

Accordingly, courts construing the term "order of the court" have said that the phrase implies affirmative action by the judge which is specific and limited in its application. *Loomans v. Milwaukee Mutual Insurance Co.,* 38 Wis.2d 656, 158 N.W.2d

318, 321 (1968); *Aetna Casualty & Surety Co. v. Sampley,* 108 Ga..App. 617, 134 S.E.2d 71, 74 (1963); *Puckett v. Swift & Company,* Mo.App., 229 S.W.2d 713, 717 (1950). The above authorities make clear that the phrase "order of the court", as utilized in Rule 59(f), contemplates some affirmative record action by the trial court, in order that a continuance will be said to have been granted.

In *State v. Dickson,* 53 Wis.2d 532, 193 N.W.2d 17 (1972) the court said:

"In the instant case, there was no order of the court which could have been disobeyed. The record shows that Judge Traeger relied upon the document bearing the caption, 'Circuit Court Chambers,' and rubber stamped with the name of the clerk of court. A direction issued by the clerk is not an order of the court in the sense used in legal procedures. Section 269.27, Stats., makes it clear that orders issued 'out of court' may be made only by judges or, in the appropriate cases, by court commissioners. Nowhere in the statutory recitation of the powers and duties of a clerk of court is there any grant of power to issue orders over his own signature.

"It is well recognized in Wisconsin that a clerk of court may not exercise any judicial powers. *Wisconsin Lumber & Supply Co. v. Dahl* (1934), 214 Wis. 137, 252 N.W. 714, held that, in the absence of a specific grant of power, a clerk of court could not authorize the calendaring of cases for trial. The limitations on the powers of a clerk of court were further defined in *Pacific Nat. Fire Ins. Co. v. Irmiger* (1949), 254 Wis. 207, 212, 36 N.W.2d 89, 92, wherein we said:

" ' . . . the acts of the clerk of the court are ministerial and clerical, and he may not exercise judicial power except in accordance with the strict language of a statute conferring such power upon him.'

"It is thus apparent that the clerk could not issue a directive having the authority and dignity of a court order and, in fact, in the instant case the clerk attempted no such usurpation of power. It did not purport to be an order 'by the court.' It was a mere notice signed by the clerk and carried with it none of the qualities of a properly issued order of a court." 193 N.W.2d at 22.

In *Toulon v. Nagle,* 67 Wis.2d 233, 226 N.W.2d 480, 485 the court said:

"On February 11, 1972, the parties were sent a notice by the clerk rescheduling the motions to April 21, 1972. The notice did not recite that the extension was by order of the court and it failed to state any cause for the extension. The transcript was completed on March 24, 1972, and Toulon's motion for judgment on the verdict was made on April 7, 1972, the date originally scheduled. Nagle's motions were not filed until April 11, 1972. Subsequent extensions were made by the court for cause after April 21, 1972, and are not contested by Toulon.

"Under this sequence of events relating to the extension of time on the filing and determination of motions, the trial court ultimately granted Nagle's motion for a new trial on the issue of damages with an option to Toulon, pursuant to *Powers v. Allstate Ins. Co.* (1960), 10 Wis.2d 78, 102 N.W.2d 393, but denied the rest of Nagle's motions.

"We find the decision of the trial court on the postverdict motions to be persuasive. Unfortunately the record does not show that the extension granted from April 7, 1972, to April 21, 1972, was by order of the court for cause, as required by sec. 270.49, Stats. *Loomans v. Milwaukee Mut. Ins. Co.* (1968), 38 Wis.2d 656, 158 N.W.2d 318; *Anderson v. Eggert* (1940), 234 Wis. 348, 291 N.W. 365; *Beck v. Wallmow* (1938), 226 Wis. 652, 277 N.W. 705. We determine, therefore, that the instant order granting a new trial on the issue of damages, with option to accept a lesser amount and denying Nagle's other motions is ineffective and void. *Graf v. Gerber* (1965), 26 Wis.2d 72, 76, 131 N.W.2d 863."

These authorities are representative of the law on the question and stand for the proposition that a clerk of court, absent statuto-

ry authority, has no power to issue orders over his or her own signature, and a clerk's directive which requires the exercise of judicial discretion is not an "order of the court" within the contemplation of law.

In certain specific instances the clerk of court in Wyoming has been vested with powers of a judicial nature. For instance, Rule 55, W.R.C.P. authorizes the entry of default judgments by the clerk. However, in the case of *Kimbel v. Osborn,* supra, we held that the power of the clerk of the court to enter default judgments as provided by statute [6] only allows the clerk to enter judgments for fixed sums. We said that the statute does not grant to the clerk any discretionary power and we emphasized that the clerk's authority is purely ministerial in character. *Kimbel v. Osborn,* 156 P.2d at 288. We said at p. 287 of that same opinion:

> "It is reasonably apparent from the views expressed by the authorities reviewed above that statutes authorizing Clerks to enter judgments in certain cases should be strictly construed and unless the letter of the law is complied with, as regards the power granted, the action of such officials must be treated as void."

In *Bertagnolli Bros. v. Bertagnolli,* supra, the clerk entered a default judgment as he was authorized to do by statute. But the judgment was entered at a time when there was a demurrer to the complaint on file and which demurrer had been filed after the statutory time for filing the answer and other papers had expired. Thus the entry of the judgment by the clerk had the effect of overruling the demurrer. This was—said this court—the exercise of a judicial function which was beyond the power of the clerk of the court.

We said:

> "The question presented in this case goes to the jurisdiction, for it involves the authority or power of the clerk to act at all, in view of the fact that a demurrer had been filed before judgment was applied for or entered, and remained on file

and undisposed of. The question to be determined is this: Did the filing of the demurrer after the time for answer had expired, without leave of court or consent, but before the application for judgment, divest the clerk of the authority conferred by statute to enter the judgment? We think it clear that unless the demurrer was a nullity, the clerk was not authorized to enter a default judgment. Acting ministerially only, he has no power to determine the sufficiency of an answer or other pleading, either as to form or substance, or whether, if filed out of time, it shall be allowed to remain on file. Only the court or judge may determine those questions.

> "An objection to a pleading on the ground that it was filed out of time may be waived, and the court in the exercise of a sound discretion may refuse to strike it from the files and consider it as though filed in time. Under section 4456, above quoted, the time for answer may be extended, and section 4418 (Comp.Stat.1910) provides that the court, or a judge thereof in vacation, may, for good cause shown, extend the time for filing any pleading upon such terms as are just. If the plaintiff had moved to strike the demurrer from the files, the court might have overruled the motion and allowed the pleading to stand, which would be conclusive unless excepted to and subsequently set aside. *Parker v. Haight,* 14 Ohio Cir.Ct. 548; *Newsom's Adm'r v. Ran,* 18 Ohio 240; *Seymour v. Railway Co.,* 44 Ohio St. 12, 4 N.E. 236; *Lyons v. Fidelity Lodge,* 2 Wkly. Law Bul. (Ohio) 97; *Hengehold v. Gardner,* 4 Wkly. Law Bul. (Ohio) 958; *Carver v. Williams,* 6 Wkly.Law Bul. (Ohio) 672. The showing necessary or sufficient to prevent the striking from the files of a pleading filed out of time is not involved in the question now being presented and considered; the material point is that the court possesses the power to determine the matter." 148 P. at 375–376.

---

**6.** *Kimbel v. Osborn,* supra, dealt with construction of W.R.S. § 89–1207 (1931) which was later superseded by the adoption of Rule 55, W.R.C.P. See: Rule 87, W.R.C.P.

I see an analogy between *Bertagnolli* and the case at bar. In the instant matter—if the rule of *Bertagnolli* is to be followed—it must be said that the entry of the "Notice of Setting" was not and could not substitute for a court order granting an extension of time within which to decide a motion for a new trial. If that be the case, then, there being no extension, this court has no jurisdiction because the notice of appeal was filed late. To say it another way, if it be argued that the clerk's "Notice of Setting" constituted an order extending the time within which the motion for new trial could be considered and decided, then—under *Bertagnolli*—the clerk was without authority to exercise judicial discretion and the entry was a nullity for this purpose.

In *Kimbel v. Osborn,* supra, we considered this same statute which authorizes the clerk to enter a default judgment. We made the following observation as we harked back to *Bertagnolli,* supra, 156 P.2d at 283–284:

"So in *Bertagnolli Brothers v. Bertagnolli,* 23 Wyo. 228, 148 P. 374, 375, decided in 1915 with the law of 1905, supra, before it this Court said with reference to the Clerk's authority thereunder that:

" 'It is generally held, under such a statute, that it directs the judgment to be entered, and that the clerk acts merely in a ministerial capacity; and upon that ground the validity of statutes conferring such authority upon the clerk is upheld. See *Utah Ass'n, etc. v. Bowman,* 38 Utah 326, 113 P. 63, Ann. Cas. 1913B, 334. The court in the case cited, speaking of this power of the clerk, say: "This duty is imposed by law, and the clerk has no discretionary powers with respect thereto. His act in entering such a judgment is no more judicial or discretionary than his act in entering a judgment upon the verdict of a jury or the finding of the court would be. In either case the law imposes the duty, and in entering the

judgment the clerk merely executes what the law requires of him." Hence it must appear that any judgment so entered by the clerk was within the authority conferred by the statute, or otherwise the judgment will be void.'

"This Court's especially significant comment in the language quoted last above appears in the last sentence thereof."

See also: *Cheshire v. First Presbyterian Church,* 221 N.C. 205, 19 S.E.2d 855 (1942); *Kelone v. Kelone,* La.App., 209 So.2d 803 (1968). The lesson to be taken from *Bertagnolli, Kimbel* and other cited cases is that even where a clerk of court is vested by statute (or rule) with the power to enter judgments, in doing so the clerk is only acting in a ministerial capacity and cannot extend that power to areas traditionally reserved to the judge of the court by whom the clerk is employed. As we have noted, the judge himself cannot delegate his powers and duties to the clerk of court. 14 C.J.S. Clerks of Court § 35, supra.

Considering these authorities, I am of the opinion that action by a clerk of court in setting a hearing for a motion for new trial cannot amount to an "order of the court" granting an extension under Rule 59(f), if, by chance, the setting places the time for argument past the 60-day limitation. I would hold that in order for the Rule 59(f) extension to be granted, the trial judge is required to take some affirmative action, clear on the record, and to issue an order specifically stating that an extension is granted and that the order must be filed pursuant to § 1–16–301, W.S.1977.[7] Under the conditions expressed by Rule 59(f), this order can be issued either by the judge on his own initiative or at the request of the parties. Clearly such a decision is within his discretion, but the decision is of such a nature that the judge cannot delegate the authority to his clerk of court. Rule 59(f) simply does not contemplate any action by any person or authority except the trial judge himself since it is the judge who is charged with ruling on the motion.

---

7. § 1–16–301 provides in pertinent part:
"All judgments and orders must be entered in the journal of the court and specify clearly

the relief granted or order made in the action.
* * *"

I note in passing that we left similar questions open in *Murry v. State,* Wyo., 631 P.2d 26 (1981). There we noted:

"The record does contain a setting of the motion for a new trial for hearing on December 4, 1980, made by the clerk of court on November 26, 1980. Assuming either or both of these occurrences to be valid (oral granting of continuance by the district judge without a contemporaneous record thereof or granting of a continuance by the clerk of court), * * *." 631 P.2d at 28,

and expressed doubt as to whether or not an oral pronouncement or setting by the clerk would satisfy the extension provision of Rule 34, W.R.Cr.P.

The appeal on the merits should be dismissed because there is no "order of the court" in the record which grants an extension within which to determine the new-trial motion. The motion was deemed denied within 60 days of the judgment which date was June 26, 1981. Since the notice of appeal was not filed until July 23, 1981, it was not, therefore, filed in accord with Rule 2.01, W.R.A.P., and the untimely filing of a notice of appeal has heretofore been held to be jurisdictional. *Murry v. State,* supra; *State v. Berger,* Wyo., 600 P.2d 708 (1979); *Snell v. Ruppert,* Wyo., 541 P.2d 1042 (1975); *Rutledge v. VonFeldt,* supra at n.3.

In my judgment, the only issue available for our review concerns the denial of appellant's Rule 60(b), W.R.C.P. motion. I would hold that a review of the briefs precludes discussion of the trial court's denial of the Rule 60 motion since appellants have failed to cite any cogent authority for their position. For that reason I would not address the issue. *Elder v. Jones,* Wyo., 608 P.2d 654 (1980); *Merritt v. McIntyre and McIntyre Garden Center,* Wyo., 613 P.2d 206 (1980).

I would add this caveat: The majority of the court have resolved to decide this case on its merits in spite of what I consider to be a clear jurisdictional defect. This says to me that the majority will dismiss some appeals where the appeal requirements are jurisdictionally defective but, if it suits their fancy, will refuse to dismiss other appeals even though the record reflects a jurisdictional imperfection. This is patently unfair to all of those who have felt the sting of this court's prior orders of dismissal. For me, the majority's decision to decide this case on its merits has the effect of discarding our longstanding rule that a late notice of appeal automatically deprives the Wyoming Supreme Court of jurisdiction.

Thus, I regret all of the votes I have cast in the past for the dismissal of appeals upon the grounds that the Wyoming Rules of Appellate Procedure have not been complied with, and I cannot again vote, as I have for nearly eight years, to automatically deny an appellant his right to the appellate processes in this court due to the failure to timely comply with a rule of appellate procedure. I will, hereafter, consider each excuse for a late appellate filing upon its merits—just as the majority has done in this case.